In re OAKS PARTNERS, LTD., a
Georgia Limited Partnership,
Debtor.

Bankruptcy No. 89–00948.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Dec. 9, 1991.

Mark S. Kaufman, J. James Johnson, Long, Aldridge & Norman, Atlanta, Ga., for debtor.

## ORDER

JOYCE BIHARY, Bankruptcy Judge.

This Chapter 11 single asset real estate case is before the Court on two competing plans, a reorganization plan proposed by the debtor and a liquidation plan proposed by First Union Real Estate Equity & Mortgage Investments ("First Union"). Debtor and First Union object to each other's plans on numerous grounds. The key issues raised by the objections to debtor's plan include the appropriate cramdown interest rate and whether payments made by debtor

to First Union during the bankruptcy can be applied to reduce First Union's claim. It is appropriate to address and rule on these issues prior to addressing First Union's other objections to debtor's plan or debtor's objections to First Union's plan.

The background facts are as follows. Debtor Oaks Partners, Ltd. ("Oaks") is a syndicated limited partnership formed in 1984 for the purpose of owning and operating an apartment complex located in DeKalb County, Georgia known as The Tahoe Oaks Apartments (the "Project"). Investors Realty Group II ("IRG") is the general partner of Oaks Partners. Mr. David Baker is a general partner of IRG and has served as the debtor's representative in this Chapter 11 case. Oaks Partners currently has 53 limited partners.

In November of 1984, debtor purchased the Project from Consolidated Capital Realty Investors ("CCRI") for approximately $17,000,000.00. As part of the purchase price, Oaks gave CCRI a note in the original amount of $13,800,000.00 (the "Wrap Note"). The Wrap Note was secured by the Project and an assignment of rents. The Wrap Note is a type commonly known in the industry as a wrap around note. The Wrap Note is currently held by First Union.[1] The original principal balance of the Wrap Note includes the unpaid principal balance of two other notes, and the current holder of those two included notes is Mutual Life Insurance Company of New York ("MONY").

First Union's claim as of the petition date was $14,360,000.00. Pursuant to Debtor's motion to value First Union's security for purposes of confirmation, the Court found that the fair market value of the Project was $12,036,200.00. (Order, September 14, 1990). At the confirmation hearing, debtor argued that the Project had decreased in value since September, 1990 by $100,000.00. Considering all the evidence presented including the testimony of debtor's representative that he did not believe the Project had declined in value in the last year, the Court finds that the value of the Project at confirmation is $12,036,200.00.

The Court is not aware of anything in the record regarding a valuation of the Project at the time the Chapter 11 petition was filed. First Union has not argued that the Project has declined at all in value from the commencement of the case until confirmation.

During the pendency of this case, debtor has paid First Union a total of $3,111,227.00.[2] This $3,111,227.00 was paid out of rents collected by debtor and paid over to First Union pursuant to a Consent Order entered May 12, 1989. The Consent Order does not reflect any intention to consider these payments as adequate protection payments, and the Consent Order specifically left open the question of how the payments should be applied. The parties agree that an additional $44,617.00 should be added to post-petition payments for roof repairs pursuant to another consent order entered February 5, 1991. Thus, the post-petition payments from debtor to First Union total $3,155,834.00.

## DESCRIPTION OF THE DEBTOR'S PLAN

First Union's claims are classified in Classes 2 and 4, with Class 2 being First Union's secured claim and Class 4 being First Union's unsecured claim, if one exists. Debtor's Plan provides for the payment of the total amount of First Union's claims in full over time.

Debtor's Plan modifies the interest rate and other terms of the Wrap Note, reduces the balance of the debt by application of $180,000.00 of the payments Oaks has made since filing this Chapter 11 case, and converts the debt service payments to a net cash flow mortgage subject to a minimum monthly payment of $93,500.00. Debtor's Plan provides that interest will accrue on the balance of the Modified Wrap Note (as defined in the Plan) at an interest rate of

---

1. Oaks has challenged First Union's acquisition of an interest in the Wrap Note in an adversary proceeding.

2. This number reflects payments through December, 1991.

9.25% per year. First Union is impaired and has rejected Debtor's Plan.

Under Debtor's Plan, First Union is obligated to make periodic payments to MONY, the holder and owner of the two notes which were included within the balance of the original Wrap Note. The Plan contemplates full and complete payment to First Union by June 30, 2000, with First Union making full and complete payment to MONY, the holder of the wrapped notes. Such repayment could occur at an earlier date should the Project be refinanced or sold. MONY's claim is in Class 3, and MONY has accepted Debtor's Plan.

In addition, debtor's Plan contemplates that additional cash payments will be made by certain limited partners of Oaks or other investors. The anticipated net proceeds of between $450,000.00 and $621,725.00 from these payments will be used for the benefit of the Project and, in particular, a portion of the proceeds may be used for payment of shortfalls, if any, in the cash flow from the Project required to pay First Union the minimum monthly interest payments.

The Plan provides that all administrative expenses (Class 1) will be paid, in cash, in full on the Effective Date, unless the persons or entities owed such expenses consent to the payment in installments after the Effective Date. Class 1 is not impaired. Tenants of the Project with security deposits held by Oaks (Class 6) will be treated pursuant to the terms of their respective lease agreements and are unimpaired.

The general unsecured creditors of Oaks (Class 5) will be paid 80% of their Allowed Claims in cash within 30 days after the Effective Date. This class is impaired and has accepted Debtor's Plan. IRG will receive nothing on its claims (Class 7) for partnership administration fees arising prior to the Effective Date, and IRG has accepted Debtor's Plan. The contingent subrogated claim of Safeco (Class 8) will be paid in full in three equal consecutive monthly installments. Safeco has accepted Debtor's Plan. Partners in Oaks who have advanced sums for payment of legal fees or other expenses incurred by Oaks in this case (Class 9) will be paid the amount of the sums advanced plus fourteen percent per annum interest, compounded annually, but all such payments shall be paid only out of any positive net cash flow of the Project or any capital receipts generated by the sale or refinancing of the Project, and only after full payment of all other claims as provided in the Plan and after payment of all other debts of Oaks then due and payable.

Finally, Oaks intends to raise, through a supplemental offering of limited partnership interests, additional funds from the limited partners of Oaks or other parties (hereinafter referred to as "Investors") in the net amount of from $450,000.00 to $621,725.00 which would be available to subsidize Oaks' future expenses and obligations under the Plan. Oaks is required, within 60 days after confirmation, to obtain at least $225,000.00 and promissory notes due approximately one year after the Effective Date so that the total amount of funds received and amounts owed to Oaks under such promissory notes is at least $450,000.00. Investors will receive a new class of units of limited partnership units known as Class B Units. Class B Units will be allocated 98% of the partnership, while the interests of existing limited partners will be reduced to 1% and the general partner will have a 1% interest.

## DESCRIPTION OF FIRST UNION'S PLAN

First Union's Plan is a liquidation plan. It requires Debtor to obtain an executed contract to sell the Project within 90 days for a net price of more than $14,000,000.00. If debtor fails to do so, the automatic stay is lifted, allowing First Union to foreclose at any price.

## THE CRAMDOWN INTEREST RATE

First Union has not accepted debtor's plan and is impaired under debtor's plan. Thus, debtor has requested that its plan be confirmed under the "cramdown" provisions in § 1129(b) of the Bankruptcy Code. Under § 1129(b)(1), a plan can be confirmed notwithstanding the impairment of and

nonacceptance by a class of claims, if the plan does not discriminate unfairly and if it is fair and equitable with respect to such class of claims. Section 1129(b)(2) goes on to describe what "fair and equitable" means with respect to secured claims, unsecured claims, and interests. The condition that a plan be fair and equitable with respect to a secured claim includes the requirement that the secured claim holder receive "on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan" of at least the amount of its allowed secured claim. 11 U.S.C. § 1129(b)(2)(A)(i)(II). In other words, the calculation to be made is the present value of the proposed stream of payments using a chosen discount rate, and "present" refers to the date of confirmation. A pivotal issue in this case is whether the 9.25% interest rate to be paid to First Union will provide First Union with the present value of its claim.

The parties here disagree on the theory and the method by which the Court should determine an appropriate discount rate. Their disagreement is not surprising, as neither the statute nor the legislative history gives any meaningful guidance on how the interest rate should be determined.

The case law has produced a variety of methods for determining interest rates[3]. The operative phrase "value, as of the effective date of the plan" appears in sections under Chapters 11, 12 and 13 of the Bankruptcy Code.[4] Thus, we have cases construing this language and determining an interest rate pursuant to this language in many different contexts including restructuring car loans in consumer Chapter 13 cases, restructuring debt on family farms in Chapter 12 cases, repayment of priority tax obligations in Chapter 11 cases and restructuring wrap loans and other types of financing in Chapter 11 cases.

The key Eleventh Circuit case construing this language is the 1983 case of *Matter of Southern States Motor Inns*, 709 F.2d 647 (11th Cir.1983), where the court considered the proper method for determining the interest rate to apply in calculating deferred payments of delinquent federal taxes under § 1129(a)(9)(C).[5] The Court found that the lower court's use of the interest rate established by 26 U.S.C. § 6621 less a 1% reduction for "rehabilitation aspects" was an inadequate method for determining present value. The Court quoted the following excerpt from *Collier* on the factors relevant to determining an appropriate interest rate.

> The appropriate discount [interest] rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount [interest] rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default.

*Matter of Southern States Motor Inns*, 709 F.2d at 651 (*quoting* 5 *Collier on Bankruptcy* ¶ 1129.03, at 1129–65 (L. King, 15th ed. 1982)).

The Eleventh Circuit's criticism of the statutory interest rate in Title 26 was twofold: (1) it did not necessarily correspond with any prevailing market rate and (2) it resulted in the same rate for all plans, ignoring variations between the term of the payout, the quality of the security, and the risk of subsequent default. The Court held that the interest rate to be used in computing the present value of a claim pursuant to § 1129(a)(9)(C) should be the current

---

**3.** *See* C. Frank Carbiener, *Present Value in Bankruptcy: the Search for an Appropriate Cramdown Discount Rate*, 32 S.D.L.Rev. 42, 43 (Fall 1987); Waltraud S. Scott, *Deferred Cash Payments to Secured Creditors in Cram Down of Chapter 11 Plans: a Matter of Interest*, 63 Wash. L.Rev. 1041 (1988); *Matter of Jordan*, 130 B.R. 185, 187–189 (Bankr.D.N.J.1991).

**4.** *See* 11 U.S.C. §§ 1129(a)(7)(A)(ii), (a)(7)(B), (a)(9)(B)(i), (a)(9)(C), (b)(2)(A)(i)(II), (b)(2)(B)(i), (b)(2)(C)(i), 1225(a)(4), 1225(a)(5)(B)(ii), 1325(a)(4), (a)(5)(B)(ii).

**5.** Two other Eleventh Circuit cases deal with this language, but these cases do not address the method for calculating the interest rate. *See Foster Mortgage Corp. v. Terry (In re Terry)*, 780 F.2d 894 (11th Cir.1986); *Travelers Ins. Co. v. Bullington*, 878 F.2d 354 (11th Cir.1989).

market rate without any reduction for the rehabilitation aspects of the plan. Unfortunately, *Southern States* does not tell us how to determine the market rate. In that case, the appellant apparently had agreed to accept a particular rate, and so the case was remanded with instructions to apply the agreed upon rate.

The parties here strongly dispute the relevance of the contract rate of interest, that is, the rate of interest in the original Wrap Note. Debtor argues that 9.25% is the effective rate under the Wrap Note and that this is highly relevant to determining the required interest rate under § 1129(b)(2)(A)(i)(II).[6] Debtor's argument is premised largely on the notion that a seller financed purchase money transaction such as this involved a high purchase price and a low interest rate, and that First Union should not be allowed a "windfall" by obtaining a higher interest rate in a cramdown context. First Union argues strenuously that once a debtor chooses not to cure and reinstate the debt, he can no longer fall back on the contract rate and must pay a market rate of interest. First Union contends that the contract rate and the historical relationship between the parties is totally irrelevant to the interest rate determination.

■ After considering the evidence and the case authority cited, the Court does not believe the contract rate in the 1984 Wrap Note is an adequate measure of the rate which will give First Union the value of its claim as of the confirmation date in 1991. The Chapter 13 cases cited by debtor are not helpful or persuasive,[7] and there is no basis for holding that the contract rate in a wrap around note should be a cap on the cramdown interest rate. *See United*

*States v. Fisher*, 930 F.2d 1361 (8th Cir. 1991). On the other hand, First Union's argument that the historical relationship between the parties and the relationship of the contract rate to the interest rate structure at the time of confirmation are totally irrelevant is also without merit. The economics of the transaction are always relevant in assessing the amount of risk involved and in determining whether the payment terms under the Plan are more or less risky than the original loan involved. *See Confederation Life Ins. Co. v. Beau Rivage Ltd.*, 126 B.R. 632 (N.D.Ga.1991); *In re Guilford Telecasters, Inc.*, 128 B.R. 622 (Bankr.M.D.N.C.1991). Thus, the contract rate and the historical relationship between the parties is of relevance to the risk analysis, but the contract rate does not serve as the exclusive measure or as an upper limit on the cramdown interest rate.

Most courts have acknowledged that a "market" approach should be used to determine the cramdown interest rate, and this is consistent with *Southern States*. However, there is no agreement over what a "market rate" is, over what constitutes an appropriate "market" in a given case, and over what is an acceptable approach to determining the "market rate".

First Union argues that the market rate is the rate for a forced loan on similar terms by a commercial lender. This is the forced loan analysis which has been rejected by a number of courts. *See Matter of Jordan*, 130 B.R. 185, 189 (Bankr.D.N.J. 1991); *See also In re Computer Optics, Inc.*, 126 B.R. 664 (Bankr.D.N.H.1991); *United States v. Doud*, 869 F.2d 1144, 1145 (8th Cir.1989). The difficulty with this approach is that the evidence is generally inconsistent with the theory. The creditor

---

6. The terms of the Wrap Note provide for successive increases in the rate of interest throughout the ten-year term of the Wrap Note, beginning with a 7.65% interest in November of 1984 and culminating in a 12% interest rate scheduled to become effective December 1, 1991.

7. Debtor relies on *In re Colegrove*, 771 F.2d 119 (6th Cir.1985) where the Sixth Circuit held that the underlying contract rate of interest should be a maximum rate of interest paid on mortgage arrearages on a principal residence in a Chapter

13 case. This reliance is misplaced. The Sixth Circuit expressly limited *Colegrove* to its facts in *United States v. Arnold*, 878 F.2d 925, 929 (6th Cir.1989), and the Eleventh Circuit has disagreed with the general proposition in *Colegrove*. *See Foster Mortgage Corp. v. Terry (In re Terry)*, 780 F.2d 894 (11th Cir.1986) (holding that the oversecured creditor with a security interest in the debtor's principal residence is not entitled to receive interest on arrearages, unless the mortgage so provides).

introduces experts who, like First Union's experts, testify that there is no market for this loan and that conventional lenders would not make a loan where the debt is equal to the value of the property. After they acknowledge the absence of a market as such, they go on to give their opinions that a lender would only make the loan if the interest rate were such and such. It is no coincidence that the rates to which they opine render the debtor's plan unfeasible.

At the confirmation hearing, First Union called two witnesses who had opinions on the interest rate. The first witness, Mr. Benjamin, was an accountant. He testified that, in his opinion, the cramdown interest rate should be a minimum of 15%. The second witness, Ms. Harrison, was in the real estate finance business. She testified that there would not be a market for a loan with a one-to-one loan to value ratio, but that if she had to put an interest rate on this transaction, she would use 4% or 5% over the current prime rate. Unfortunately, First Union's experts were not particularly convincing as to what rate might be charged on a loan with the terms of the payments to First Union under the Debtor's Plan. This was due to no fault of the experts, but it illustrates the weaknesses inherent in the "coerced loan" method of determining a cramdown interest rate. As Judge Yacos stated in *In re Computer Optics, Inc.*, 126 B.R. 664 (Bankr.D.N.H. 1991):

> [T]here is no "market" in the real world for "similar loans" when dealing with a reorganized entity coming out of a chapter 11 proceeding and it accordingly is not surprising that the case decisions taking such approach exhibit much conjecture and inconsistent results.

*In re Computer Optics, Inc.*, 126 B.R. at 672.

Finally, First Union's evidence of the absence of a "market" does not mean that a plan cannot be confirmed under the cramdown provisions. By definition, under § 1129, a secured creditor is required to receive only equivalent value to its interest in collateral, a one-to-one ratio of loan-to-value. Experts who testify that loans are not generally made with this one-to-one ratio do not change the law or negate the cramdown provisions of the Code. Put another way, there is still objective value to a loan, notwithstanding the fact that a creditor or an expert would not make such a loan. *See Travelers Ins. Company v. Bullington*, 878 F.2d 354, 358 (11th Cir. 1989).

■ The better approach to determining a cramdown interest rate is the "time value of money approach", also referred to in some cases as the "formula approach". Here, the court takes an appropriate risk-free rate and adds an upward adjustment to take into account risks associated with the debtor, the security, and the plan. *See In re Fowler*, 903 F.2d 694 (9th Cir.1990) (where the Court approved the formula approach, using the prime rate as a risk free base); *Doud*, 869 F.2d at 1145 (Court took yield on treasury bonds and added 2% for overall risk associated with a Chapter 12 reorganization); *Computer Optics*, 126 B.R. at 672 (rate was 2% over prime and 4% over treasury bond of like maturity); *Guilford Telecasters*, 128 B.R. at 626 (prime rate plus 1–½%); *In re Koch*, 131 B.R. 128 (Bankr.N.D.Iowa 1991) (rate was 2% over rate on 30–year treasury bond); *In re E.I. Parks No. 1 Ltd. Partnership*, 122 B.R. 549, 555 (Bankr.W.D.Ark.1990) (Court used risk-free rate plus 2%); *In re LLL Farms*, 111 B.R. 1016 (Bankr.M.D.Ga.1990) (court used yield on treasury bond plus 2%); and *In re Aztec Co.*, 107 B.R. 585 (Bankr. M.D.Tenn.1989) (2% over relevant treasury bill rate).

This time value of money approach is acceptable from a theoretical standpoint. An interest rate is generally said to have three components: (1) inflationary expectations, (2) a "real" interest rate and (3) a risk component. *See Deferred Cash Payments to Secured Creditors in Cram Down of Chapter 11 Plans: A Matter of Interest, supra* at 1046; Paul A. Samuelson & William D. Nordhaus, *Economics* 722–726 (13th ed. 1989). Bankruptcy courts should not be expected to and do not need to make explicit findings about these

first two components.[8] Indeed, the rate of interest paid on any safe investment will include inflationary expectations and a "real" interest rate. Thus, taking the published rate on a relatively riskless investment such as a government security of appropriate duration provides a reasonable base to which a risk factor particular to the Chapter 11 case can be added.

This approach is also not inconsistent with *Southern States*. In the *Doud* case, the Eighth Circuit adopted what was in essence the time value of money or formula approach and cited its earlier decision in *United States v. Neal Pharmacal Co.*, 789 F.2d 1283 (8th Cir.1986). The *Neal Pharmacal* case dealt with the repayment of tax claims and specifically followed *Southern States*.

Applying the formula approach, the most appropriate risk-free interest rate is the yield on a treasury obligation with a maturity matched to the term of the payment proposed.[9] Debtor's plan proposes full payment to First Union on June 30, 2000, and the published yield as of the week of confirmation on a treasury bond maturing in August of the year 2000 is an appropriate base rate. The average of the yield on this instrument for the week of December 2, 1991 is 7.24%.[10] To determine what additional interest rate should be added to this base rate, the risks involved in this particular case must be analyzed.

Debtor offered evidence with respect to the quality of the security, the risk of subsequent default and risk factors involved with the debtor. Debtor's witnesses credibly testified that the Project is well managed and that the rental market for this type of apartments has bottomed out

and is positioned to improve. The apartments are now 96% occupied, there is a low turnover rate and debtor's witnesses testified that the Project had been performing better than the market. Debtor presented a feasibility analysis and projections that appear reasonable. The negative factors are that this is a Class "B" property and considerable maintenance has been deferred during the bankruptcy, although debtor presented reasonable cost estimates for repairs and maintenance which are a part of debtor's plan.

Debtor's representative, Mr. Baker, credibly testified that there was less risk of default under debtor's plan than with the Wrap Note structured in 1984. The loan amount is lower, and the ratios are more favorable to the lender. The original loan here was not the product of conventional financing, and debtor presented evidence that in 1984, the Wrap Note was 175% of what the debtor could have borrowed in a conventional loan. The terms of the plan are that the secured claim is equal to the value of the Project. The evidence strongly suggests that the debtor will be able to make all plan payments to First Union. However, if debtor defaults in any proposed plan payment to First Union, First Union has available its remedy of foreclosure. Thus, First Union's risk of loss on default is not abnormally high. Finally, an expert called by debtor, Mr. Jones, testified that in order to establish a market rate, 150 to 250 basis points (1½% to 2½%) should be added to the treasury bond rate.

First Union argues that a high degree of risk is evidenced by debtor's treatment of Class 9 creditors and by the provisions relating to debtor's offering of new limited partnership interests. Class 9 creditors are

---

**8.** The Court's reading suggests that there are many different theories of interest, and the literature on interest in the fields of economics and finance is filled with many complicated explanations as to why there even is interest, how interest should be determined and how it can in fact be determined. What explains the behavior of interest over time? Is it a society's consumption/savings decisions? Is it the technical net productivity of capital? Is it the government's monetary and/or fiscal policies? Economists and bankers do not agree, and judges and lawyers will add little to the debate.

**9.** The evidence at the confirmation hearing on October 21, 1991 was that the yield on a ten-year treasury bond was 7.62% and the prime rate was 8%. Interest rates have declined since the hearing, and the prime rate is now 7½%.

**10.** *Treasury Bonds, Notes & Bills*, Wall St.J., Dec. 3, 1991, at C19; *Id.*, Dec. 4, 1991, at C17; *Id.*, Dec. 5, 1991, at C17; *Id.*, Dec. 6, 1991, at C15; *Id.*, Dec. 9, 1991, at C16.

partners who have advanced sums for payment of legal fees and other expenses during the Chapter 11 case. While debtor's plan calls for payment to them in full plus 14% interest, the 14% rate is unrelated to any market rate and was chosen to create an incentive for limited partners to contribute. Debtor convincingly argues that this is a medium through which the debtor raised equity, rather than creating debt. Furthermore, no payments can be made to Class 9 creditors until all other claims and debts are paid. The new Investors are to be paid twenty percent on their investment and then they receive 98% of the debtor. Given the fact that they will receive 98% of the debtor, it is not clear why they would first receive a payment denominated as interest. Again, all interests of new partners are subordinated to the payment of all other creditors' claims, and the offering is an equity offering. Thus, it is difficult to say that these terms demonstrate anything meaningful about the risk to First Union.

The Court recognizes that no method of determining an appropriate cramdown rate is perfect. However, we are not looking for perfection, but only a reasonable method of assessing risks in order to decide whether to confirm a plan. Describing the positive and negative aspects of the collateral and the debtor are not that difficult, but ascribing a particular number of basis points to the overall risk factor is easier said than done. The disappointed party, whether it be the debtor or the creditor, will likely think the adjustment arbitrary. The Ninth Circuit recognized this in *In re Camino Real Landscape Maint. Contractors*, 818 F.2d 1503, 1508 (9th Cir. 1987), stating that "rough estimates are better than no estimates" and holding that they were willing to "rely on the expertise of the bankruptcy judge". Debtor's expert would add 1-½% to 2-½%, and First Union's expert would add 4% to 5%. Considering all the evidence, the Court concludes that 3% is an appropriate risk factor. If the plan were confirmed today, the Court would add 3% to the base rate of 7.24% and

round upwards to the nearest quarter percent. This would result in an appropriate cramdown interest rate of 10-¼%.

## APPLICATION OF POST PETITION PAYMENTS

The other key issue in this case involves a dispute over how the post-petition payments made by debtor to First Union should be applied. As previously stated, First Union has received total post-petition payments of $3,155,834.00. Debtor proposes to apply $2,975,834.00 of these post-petition payments to First Union's debt and to allocate $180,000.00 to payments due First Union during the first four months of debtor's plan. The plan calls for monthly payments to First Union in the amount of $93,500.00, and during the first four months of the plan, debtor will allocate $45,000.00 a month to these payments, so that debtor will have additional funds available to make capital improvements on the Project.

Debtor agrees with First Union that the payments should be applied to First Union's debt only up until the point that the debt equals the value of the Project.[11] Thus, while applying $2,975,834.00 to First Union's claim of $14,360,000.00 yields a claim of $11,384,166.00, debtor proposes to apply only payments up until First Union's claim is reduced to $12,036,200.00, the value of the Project. What this means is that First Union is paid under the Plan on a secured claim of $12,036,200.00 and First Union has already received payments of $2,975,834.00 from the debtor. The sum of these two numbers is $15,012,034.00, and thus Debtor proposes to make payments valued at $15,012,034.00 on a claim of only $14,360,000.00.

First Union objects to applying the post-petition payments it has received from debtor to its claim on two grounds. First, First Union argues that amounts it used to pay interest on MONY's claim should not be used to reduce the principal amount of

11. The Court expresses no opinion on whether the application of post-petition payments should be capped by the value of the real estate as a

general proposition. Since the parties agreed on this point, it is not an issue in this case.

the First Union claim. Payments used by First Union to pay MONY equal $1,000,-488.22.[12]

■ The case of *In re Club Associates*, 107 B.R. 385, 395–398 (Bankr.N.D.Ga.1989) supports the reduction of First Union's claim by the amount First Union used to pay interest on the included or wrapped notes. In that case, Judge Murphy thoroughly discussed the difference between wraparound debt and a discrete second mortgage. This Court agrees with the clear analysis and reasoning of the Court in *Club Associates* and finds that debtor here should be permitted to apply the post petition payments made to First Union to reduce First Union's claim, even though First Union used some of the payments ($1,000,-488.22) to pay interest on the wrapped notes.

The cases cited by First Union involving conventional second mortgages are not helpful. In the context of a second mortgage where there is an overcollateralized first mortgage holder, the second mortgage holder frequently requests adequate protection by asking that the debtor pay interest to the first mortgage lienholder so as not to erode the junior equity. In those cases, the second mortgage holder is not asking for the interest to be paid to him. Post-petition payments in the context of a wrap note are different than in the context where the holder of the objecting claim is a junior creditor. The debtor here has one lender, not two lenders. The debtor owes no money and has no relationship with the wrapped holder, MONY. The debtor has no contractual relationship or note with MONY and has never paid MONY anything. At all times, the debtor's lender, First Union or its predecessors, has had the obligation to pay the Included Notes, and debtor has never assumed that debt. Indeed, if First Union paid off the Included Notes, that would have no bearing on the debtor's obligation, because it still has its single wrap note which it must pay.

First Union acknowledges that there are no reported decisions rejecting or criticizing *Club Associates*, but First Union is

sharply critical of the decision. First Union argues that *Club Associates* ignored the "binding precedent" of *Ridgemont Apt. Assoc. v. Atlanta English Village*, 110 B.R. 77 (N.D.Ga.1989), *aff'd, Ridgemont Apt. Assoc. v. Atlanta English Village*, 890 F.2d 1166 (11th Cir.1989). The Court has reviewed the bankruptcy court decision in *Ridgemont*, the district court decision in *Ridgemont* and the one sentence affirmance by the Eleventh Circuit affirming the ruling of the district court. In *Ridgemont*, the district court affirmed an order requiring monthly adequate protection payments be made by debtor to the first lienholder in order to compensate for an erosion in the junior creditor's claim. Although the facts there apparently involved wraparound financing, the Court's analysis was as if there had been two loans to the debtor with conventional first and second mortgages. It appears that the arguments considered by the Court in *Club Associates* regarding the distinction between wraparound financing and financing involving conventional junior and senior mortgages were never argued by the debtor in *Ridgemont* to either the bankruptcy court or the district court. There is also no indication in the Eleventh Circuit's summary affirmance that it ever considered the issue. Debtor here has pointed out that the debtor in *Ridgemont* attempted to raise the issue for the first time in briefs before the Eleventh Circuit, but that the creditor there vigorously objected to the issue being raised for the first time on appeal. Thus, this Court cannot accept First Union's argument that any of the courts in *Ridgemont* ever considered or ruled on the issue decided in *Club Associates*, i.e. the application of payments to the holder of a wraparound note when the holder uses the payments to pay interest on wrapped notes.

First Union's second argument against applying payments it received to reduce its claim is more difficult to understand. The argument, in First Union's words, is that its claim should not be reduced to the extent that payments were made from rents.

12. This amount is as of December 31, 1991.

The fundamental problem with First Union's argument is that if the payments of $3,155,834.00 are not applied to the debt, why were they made and what were they for? If they are not applied to the debt, what are they—a gift? First Union made no argument or showing at the confirmation hearing as to what should be done with the $3,155,834.00. Generally, payments made by a debtor to a creditor should be applied to the claim, regardless of the source of the payments.

First Union seems to be saying that a few courts have remarked that rents are a separate item of collateral from the real estate itself; that if the debtor uses the rents, then collateral is being eroded; that a secured party should be compensated for a diminution in the value of its collateral and that such compensation can never be applied to the debt. There are several difficulties with this argument.

■ First and foremost, a creditor is not entitled to be paid more than its claim, regardless of what kind or how much collateral secures the claim. If First Union's argument is that it still has a claim of $14,360,000.00 and it gets to keep the $3,155,834.00 in cash post-petition payments, then it is arguing for payment of $17,515,834.00 on its $14,360,000.00 claim. This makes no sense.

This Court disagrees with First Union's contention that payments which theoretically compensate for a reduction in collateral value can never be applied to the debt. There is nothing in the Bankruptcy Code that says that payments for adequate protection can never be applied to reduce the claim. The Court also has difficulty with the argument that payments of the net rents are to compensate First Union for an erosion in the rents. The use to which the rents have been put during the pendency of the proceeding has not in any way harmed First Union or eroded its collateral. The rents have been used to maintain and operate the Project all in accordance with First Union's consent or the consent of its predecessors, and all amounts not needed for the maintenance of the Project have been promptly turned over to First Union.

Thus, it is difficult to see how First Union has been harmed or how there can be any serious argument that the collateral value has been diminished.

The Supreme Court case of *United Savings Ass'n v. Timbers of Inwood Forest,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), sheds some light on this problem. The Court held that an undersecured creditor was not entitled to interest on its collateral during the time it was stayed from foreclosing by the automatic stay in 11 U.S.C. § 362 in order to assure adequate protection under § 362(d)(1). The case involved an apartment project and the creditor's security interest included an assignment of rents. As is the case here, the debtor in *Timbers* agreed to pay the undersecured creditor post-petition rents from the apartment project minus operating expenses.

In discussing the meaning of the words "interest in property" in § 362(d)(1) and (2), the Supreme Court held that it meant the creditor's security interest "without taking account of his right to immediate possession of the collateral on default." *Timbers,* 484 U.S. at 372, 108 S.Ct. at 630. Discussing § 506(a), the Court stated:

> In subsection (a) of this provision *the creditor's "interest in property" obviously means his security interest without taking account of his right to immediate possession of the collateral on default. If the latter were included, the "value of such creditor's interest" would increase, and the proportions of the claim that are secured and unsecured would alter, as the stay continues—since the value of the entitlement to use the collateral from the date of bankruptcy would rise with the passage of time. No one suggests this was intended.* The phrase "value of such creditor's interest" in § 506(a) means "the value of the collateral." H.R.Rep. No. 95–595, pp. 181, 356 (1977); see also S.Rep. No. 95–989, p. 68 (1978). We think the phrase "value of such entity's interest" in § 361(1) and (2), when applied to secured creditors, means the same.

*Timbers*, 484 U.S. at 372, 108 S.Ct. at 630 (emphasis added).

■ Just as the creditor's "interest in property" does not include the right to immediate possession of the real estate, it does not include the right to immediate possession of the rents. The creditor should not be paid some extra amount for having been stayed from collecting rents any more than it should be paid for the delay in exercising its rights to foreclose on the real estate. If the right to possess rents is included in the meaning of "interest in property" as First Union suggests, then the value of the secured claim would alter and rise as the stay continues. It is undisputed that at the commencement of this case First Union was an undersecured creditor. Its claim was for $14,360,000.00, and the value of the Project was $12,036,200.00.[13] Its position now that it has a secured claim of $14,360,000.00 is based on the premise that the value of its secured claim has increased as the stay continued. This is just what the Supreme court said was not intended.

The Supreme Court's discussion in *Timbers* of 11 U.S.C. § 552(b) also acknowledges that post-petition rents should be applied to satisfy the secured creditor's claim. The Court stated that § 552(b) requires a perfected security interest in rents as "a condition of having them *applied to satisfy the claim of the secured creditor* ahead of the claims of unsecured creditors". *Timbers* at 484 U.S. 374, 108 S.Ct. at 631 (emphasis added). The Court does not say that the secured creditor receives the rents and does not have to apply it to satisfy the claim.

It is important to recognize that absent bankruptcy, if a creditor such as First Union enforced its assignment of rents and took possession of the rents without foreclosing, it would still need to apply those rents to the debt as it existed at the time the rents were received. The only way First Union could collect the rents and not apply them to the debt would be to foreclose and become the owner of the property before collecting rents. However, the bankruptcy filing invokes the automatic stay which prevents the creditor from foreclosing. If First Union is allowed to keep the rents and not apply them to the debt, then one of the purposes of the automatic stay is defeated. In effect, allowing First Union to take the rents and not apply them to the debt amounts to a retroactive granting of relief from the stay. This would be particularly inappropriate here where First Union has not moved for relief from the automatic stay or sought an adequate protection order throughout the pendency of the case.

The only cases cited by First Union for its argument against applying rents paid to the debt are *In re Flagler-at-First Associates, Ltd.,* 114 B.R. 297 (Bankr.S.D.Fla. 1990) and *In re Landing Associates, Ltd.,* 122 B.R. 288 (Bankr.W.D.Tex.1990). *Flagler* is not persuasive here, and *Landing* does not support First Union's position.

In *Flagler,* the court was considering the amount of a secured claim, where the collateral was an office building. Monthly payments from rentals were paid to the secured creditor, and debtor sought to reduce the secured claim by the amount of the payments. The court phrased the issue before it as whether the creditor should be forced to credit post-petition payments to the "secured" portion of its claim and held that it should not. *Flagler* does not say that rents should not be applied to reduce the unsecured portion of the claim. *Flagler* does not require payment in excess of a creditor's claim by virtue of a security interest in rents. *Flagler* also appears to be based in large part on what the parties intended when they agreed to the payment of net rents. The parties there expressly considered these payments as adequate protection against the erosion of the secured claim through depletion of the post-petition revenues. *See Confederation Life Ins. Co. v. Beau Rivage Ltd.,* 126 B.R. 632, 639 n. 11 (N.D.Ga.1991). In the case at bar, the debtor and First Union did not have any agreement on how the rents

---

**13.** First Union has not contended that the value of the Project declined since the case was filed, and the Court valued the Project at $12,036,200.00.

should be applied. Finally, while the courts have politely discussed *Flagler* and have attempted to distinguish it, it is difficult to understand or apply and it has not been generally followed. *In re Reddington/Sunarrow Ltd. Partnership,* 119 B.R. 809, 813 (Bankr.D.N.M.1990); *Beau Rivage,* 126 B.R. at 639.

*In re Landing Associates, Ltd.,* 122 B.R. 288 (Bankr.W.D.Tex.1990) does not support First Union's argument. There, the Court was valuing a secured claim pursuant to 11 U.S.C. § 506(a) for purposes of confirmation. Unlike the case here, the net rents had not been paid over to the secured creditor. The debtor in *Landing* wanted to be able to use some $700,000.00 in rents it had collected to pay down the secured creditor's claim as of the date of filing in order to avoid paying any post-petition interest, costs and fees. Here, debtor does not have net rents on hand because debtor has paid over the net rents each month. Here, debtor does not propose to use the rents to pay the secured claim as of the date of filing, but to apply the payments to the whole claim as of the date of filing. In fact, the debtor proposes to make payments valued at $15,012,034.00, which is $652,034.00 more than First Union's claim of $14,360,-000.00 as of the petition date. This extra $652,036.00 is presumably for interest and fees. *Landing* simply does not support First Union's argument that it is entitled to keep the $3,155,834.00 in net rents and not apply it to *any* portion of its claim.

First Union urges this Court to accept the holding in *Landing* that placed a discrete value on the rents over and above the value of the real property at the time of confirmation.[14] However, given the facts and procedural posture of this case, it does not matter whether rents are considered as a separate item of collateral. Here, the debtor does not have the rents on hand and thus there is no cash collateral on hand at confirmation to add to the value of the real estate. The net rents have been paid to First Union. Even if rents are considered as distinct from the real estate, once First Union received payments from the rents, it in effect realized on a portion of its collateral. A creditor who realizes on its collateral generally applies the proceeds of that realization to the debt. Debtor's plan gives First Union full credit for rents and for the Project. In other words, even if one accepts that rents are a separate item of collateral, as they are paid over to the creditor, the claim is reduced. The secured claim would only be augmented if the real estate increased in value or if the rents were collected by the debtor and not paid over to the creditor as in *Landing.* Thus, if the creditor is undersecured when the case is filed, if the real property does not increase in value, and if net rents are paid over to the secured creditor, then the secured claim ordinarily should not increase.

First Union's only other objection pertaining to debtor's proposed application of payments is to the allocation of $180,000.00 toward the first four payments under debtor's plan. That objection is overruled. *In re Sherwood Square Associates,* 87 B.R. 388 (Bankr.D.Md.1988); *See also Beau Rivage,* 126 B.R. at 640.

■ In accordance with the above, debtor can apply $2,975,834.00 of the post-petition payments to First Union's claim of $14,036,000.00 to reduce First Union's claim to the value of the Project which is $12,036,200.00, and debtor can apply $180,-000.00 of the post-petition payments to payments due under the plan.

As stated at the beginning of this Order, First Union raised other objections to the debtor's plan, and debtor raised objections to First Union's plan. It appears, however, that a number of these other objections

---

**14.** While the Court does not need to reach the issue of whether rents are to be valued separate and apart from real estate, there are legitimate arguments for and against separate valuation depending on the purposes of the valuation. The parties here have not spent any significant time briefing this point, but the value of apartment real estate is derived, in large part, from its income producing potential, and thus counting the rents in addition to the real estate is troublesome in many contexts. *Landing* is on appeal to the district court, and the Court has not found any reported decisions following *Landing.*

may be moot as a result of the Court's ruling on the interest rate and the application of payments. Rather than speculate as to which issues remain outstanding at this juncture, the parties are directed to appear on January 8, 1992 at 10:00 a.m. in Courtroom 1708 and advise the Court which factual or legal issues remain to be adjudicated in order to determine which plan should be confirmed.

IT IS SO ORDERED.