**In re 354 EAST 66TH STREET
REALTY CORP., Debtor.**

**Bankruptcy No. 893–83583–478.**

United States Bankruptcy Court,
E.D. New York.

Feb. 6, 1995.

Berkman, Henoch, Peterson & Peddy, P.C. by Ronald M. Terenzi, Garden City, NY, for debtor.

Robinson, Brog, Leinwand, Reich, Genovese & Gluck by Robert Leinwand, Christine Black, New York City, for Coolidge New York Equities Ltd. Partnership.

## DECISION AND ORDER

DOROTHY EISENBERG, Bankruptcy Judge.

This matter is before the Court pursuant to the hearing on the Disclosure Statement filed by 354 East 66th Realty Corp. (the "Debtor"). In its Plan, the Debtor proposes to apply the adequate protection payments already made to Coolidge New York Equities Limited Partnership ("Coolidge" and/or the "Secured Creditor") to reduce its secured claim against the Debtor. If the adequate protection payments made to Coolidge are applied to reduce its debt, this will wipe out the undersecured portion of Coolidge's claim, leaving it with its fully secured claim. Coolidge has opposed such treatment, claiming that it has a right to retain the net rents as both adequate protection for its perfected lien on the rents, and as repayment for this additional collateral pursuant to Section 552(b) of the Bankruptcy Code.

## FACTS

The Debtor filed for relief under Chapter 11 of the Bankruptcy Code, on June 22, 1993 (the "Filing Date"). The Debtor has remained in possession and control of its property pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor is a New York corporation formed to own and operate the building designated and located at 354 East 66th Street, New York (the "Property"). As of the Filing Date Home Savings Bank (the "Bank") held a note and mortgage (the "Mortgage") whereby the Debtor as mortgagor pledged the Property for the repayment of $1,700,000 pursuant to a Consolidation and Spreader Agreement dated March 31, 1989. The Mortgage contains an assignment to the Bank of all leases, together with all rents and income of any nature derived from the Property. The Bank filed a secured claim in the Debtor's case in the amount of $2,268,755.56, as of the date of the filing of the Petition.

During the post petition period, the Mortgage was purchased by and assigned to Coolidge.

Prior to the assignment of the Mortgage to Coolidge, the Bank and the Debtor negotiated a consensual Cash Collateral Order which was so ordered by this Court on December 16, 1993 (the "Cash Collateral Order").

In January, 1994, pursuant to the Cash Collateral Order, the Debtor paid in excess of $39,000 to the Bank. Commencing in February, 1994, the Debtor has paid to the Bank, and its successor in interest Coolidge, the sum of $15,000 per month. The Cash Collateral Order provides that the payments received by the Bank (and Coolidge) are meant to be adequate protection payments. This $15,000 per month is net of all necessary payments to maintain the property while the Debtor is in Chapter 11.

By applications dated November 23, 1993, and April 1, 1994, Debtor, with the Bank's and Coolidge's consent, sought, and was granted, orders of this Court authorizing payments in the amount of $119,173.59 and $35,000 respectively, toward pre-petition real estate taxes.

On October 3, 1994, a valuation hearing was held in order to determine the market value of the Property for confirmation purposes. At the conclusion of the hearing, the Court determined that the value of the Property is $2,068,965. Therefore, as of the date of the valuation hearing and for plan confirmation purposes, the value of the Property is $2,068,965. Pursuant to Section 506(b) of the Bankruptcy Code, Coolidge was undersecured as of October, 1994, and had an unsecured claim for the difference between its claim as of the date of the filing and the value of the Property as of October, 1994. In making its valuation, the Court took into consideration the present value of the future projected cash flow of the Property (i.e., the capitalization rate).

No valuation of the Property as of the Filing Date was made by the Court. However, there are some indications that the value of the Property has increased since the Filing Date. For example, the rent roll is currently in excess of $40,000 per month,

whereas the rent roll was approximately $37,000 per month while operated by the Secured Creditor's appointed receiver at the commencement of the case. The Debtor continues to maintain the premises and its value has not diminished. The Debtor has made payment of $154,173.59 towards pre-petition real estate taxes, and is current with all post petition taxes. The value of Coolidge's collateral has certainly not decreased from the date of the filing of the Petition. The Debtor has also paid an aggregate of $218,685.08 to Coolidge pursuant to the Cash Collateral Order as of the end of December, 1994, which amount is approximately equal to its unsecured claim. Therefore, the Debtor believes that these payments called adequate protection payments have reduced Coolidge's claim so that it no longer has an unsecured claim.

The Debtor's Plan classifies and treats the claims and interests of the Debtor as follows:

Class 1—consists of administrative claims and is unimpaired as the administrative claims shall be paid in full on the Effective date.

Class 2—consists of priority claims under 11 U.S.C. Section 507(a)(7), estimated to be $60,000, and payable $20,000 on the Effective Date and $2,000 per month for two years, until fully paid. This Class is impaired.

Class 3—consists of the secured portion of Coolidge's claim, and is valued at $2,068,955. The original Note and Mortgage shall be reinstated in the amount of the outstanding principal ($1,711,439.17). The arrears, amounting to $338,631.31, will be paid over the course of six months from the Effective Date, together with 9% per annum interest as follows: $50,000 on the Effective Date with monthly payments thereafter in the amount of $50,000, with the final payment of all amounts outstanding due on the first day of the seventh month following the Effective Date. The Debtor shall also be granted a right of first refusal on any sale of the Note and Mortgage, and the pre-payment terms are altered from the original Note and Mortgage. This class is impaired.

Class 4—consists of all unsecured claims against the Debtor, exclusive of the undersecured portion of Coolidge's claim. These creditors are to be paid one hundred (100%) percent in twenty-four (24) monthly installments commencing one month after the Effective Date. This class is impaired.

Class 5—consists of the "Equity Security Interests". The interests shall be cancelled and all such claimants shall receive no dividends or property, and the interests shall be distributed to the New Shareholders as defined in the Plan.

As demonstrated above, the Debtor's Plan is premised on the elimination of Coolidge's unsecured claim, and the repayment of its secured claim with interest for the unpaid arrears. One of the critical components to a cramdown of objecting creditors is the accepting vote of at least two-thirds of one class of impaired creditors, which in this case the Debtor expects to be the Class 4 unsecured creditors. Coolidge has objected to the Disclosure Statement, claiming that by virtue of its perfected lien on the rents, it is entitled to treat the payments made under the Cash Collateral Order as adequate protection payments solely to compensate Coolidge for the Debtor's use of the rents. As a result, all the rents collected by the Debtor as adequate protection payments should be added to and increase this claim, which is reduced in turn by the amount of the payments made to Coolidge, resulting in a "wash" with respect to the amount of Coolidge's claim. Coolidge believes it continues to have an undersecured claim and as such would dominate the unsecured class, leaving the Debtor without an accepting class. The Debtor asserts that the payments received by Coolidge pursuant to the Cash Collateral Order must be credited against Coolidge's original claim. As a result, Coolidge no longer has an unsecured claim and therefore will not control the Class 4 unsecured creditors. Resolving this dispute will determine the threshold issue of whether the Debtor's plan is capable of obtaining the votes of at least one class of impaired creditors. If Coolidge continues to have an unsecured claim in the full amount of its undersecured claim, it will dwarf the other members of the class by its negative vote, and there will be no other consenting impaired class entitled to vote on the Plan.

The issue to be decided is how to apply the post-petition net rent payments made to the Secured Creditor, when the secured creditor is undersecured, but has a perfected lien on future rents.

## DISCUSSION

■ The issue before the Court is undecided in this Circuit, and requires a careful analysis of Sections 506 and 522 of the Bankruptcy Code as well as relevant case law, applicable prior to the Bankruptcy Reform Act of 1994. Section 506 of the Bankruptcy Code governs the amount of the secured creditor's allowed secured claim and the creditor's entitlement to interest post-petition. Section 506 of the Code provides as follows:

(a) An allowed claim of a creditor secured by a lien on property the value of which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such claim ...

(b) To the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

■ This section of the Bankruptcy Code is generally understood to mean in part that undersecured claims are not entitled to accrual of interest, fees and costs, but oversecured claims are so entitled, to the extent of the value of the property securing the debt. *United Savings Ass'n v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (*"Timbers "*).

■ Section 552 of the Bankruptcy Code sets the parameters for a secured creditor's rights in and to post-petition rents, as follows:

(b) ... [I]f the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents or profits of such property, then such security interest extends to such proceeds, product, offspring, rents or profits acquired by the estate after the commencement of the case to the extent provided by non-bankruptcy law ...

This section of the Bankruptcy Code grants to the creditor secured by a lien on rents a separate interest in addition to the secured creditor's interest in the real property. *See Timbers,* 484 U.S. at 374, 108 S.Ct. at 632. These two fundamental concepts appear to be at odds with one another in this case. On the one hand, Coolidge is not entitled to receive adequate protection payments if there is no diminution of the value of its collateral interest on its claim while it is undersecured. On the other hand, Coolidge does have a separate set of rights as a result of its perfected security interest in the rents, which rights differ from a creditor without such a perfected lien.

Cases examining this issue run the gamut, reflecting the possible ambiguity created by these provisions of the Bankruptcy Code.[1] *Timbers* provides guidance to an extent, but does not resolve the tension among the statutes. However, as the Supreme Court's only decision related to this issue, *Timbers* bears further scrutiny. The debtor in *Timbers* owned and operated an apartment project in Houston, Texas. United Savings Association of Texas held a note in the principal amount of $4,100,000, secured by a lien on the apartment project, together with an assignment of rents. It was undisputed that United Savings was undersecured, and the debtor had agreed to pay United Savings the post-peti-

1. For a thorough discussion of the current case law on this issue, see, C. Taylor Ashworth, Christopher Graver, *Application of Post–Petition Rent Payments to Undersecured Claims: Shaking the Timbers of Conventional Wisdom* (1994 National Conference of Bankruptcy Judges).

tion rents from the project, minus operating expenses. United Savings moved for relief from the stay, and continuance of the stay was conditioned upon the receipt of certain monthly payments. The Supreme Court examined the issue of whether the undersecured creditor was entitled to interest and costs accruing post-petition.

The Supreme Court distinguished between the debtor's claim and the collateral securing the claim as follows:

> Section 506(b) provides that 'to the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim.' . . . Since this provision permits post-petition interest to be paid out only of the 'security cushion,' the undersecured creditor, who has no such cushion, falls within the general rule disallowing post-petition interest . . .

*Timbers,* 484 U.S. at 373, 108 S.Ct. at 631.

The Supreme Court in *Timbers* also recognized that secured creditors with liens on rent have rights greater than those which did not have perfected liens on rents. *See Id.* at 373, 374, 108 S.Ct. at 631–32, 632. However, these additional rights were not enumerated in *Timbers,* and must be counterbalanced by the Supreme Court's further statement that one of the purposes behind Chapter 11 is to provide for the "conscious allocation of reorganization benefits and losses between unsecured and secured creditors." *Id.* at 373, 108 S.Ct. at 631.

■ Keeping the principles enunciated in *Timbers* in mind, the Court turns to the arguments made by Coolidge. The thrust of Coolidge's contention is that by virtue of its perfected interest in the rents of the property, it is entitled to not only receive the full value of its claim as determined by the valuation of the Property, but to receive any additional net rents, thereby receiving a stream of payments during the pendency of the case above and beyond its claim. Coolidge's argument is based on an assumption that the net rents increase the value of the Property as determined by ·this Court. The increase in value of the Property is then reduced as Coolidge receives the net rents. This offset-

ting creates a "wash", having no effect on the pre-petition claim or the value of the Property. In support of its contention, the Bank relies on *In re Vermont Investment Limited Partnership,* 142 B.R. 571 (Bankr.D.D.C. 1992); *In re Birdneck Apartment Associates II, L.P.,* 156 B.R. 499 (Bankr.E.D.Va.1993), and several other cases.

■ These cases all recognize that post-petition rents are collateral distinct from the real property which generates them. This Court also recognizes that post-petition rents comprise separate collateral. However, the Court parts ways with these courts with respect to the impact of this additional collateral where the creditor is undersecured at the time of the valuation hearing. The additional collateral does give Coolidge greater rights than those of secured creditors without the additional lien, as recognized by *Timbers.* One of these rights is the right to apply the net post-petition rents to Coolidge's claim to the exclusion of the other creditors. Coolidge's additional interest in the rents was also recognized and taken into consideration when the Court made its determination as to the value of the Property. However, the Court is hard pressed to make the leap in logic urged by Coolidge that the additional security interest entitles Coolidge to receive payment in excess of its original claim while Coolidge is undersecured. Although Coolidge argues that the Debtor's use of the rents erodes Coolidge's security, this is not the case. The rents are a component of the collateral, a portion of which is being paid to Coolidge and a portion of which is going towards maintenance of the property. When Coolidge receives the monthly net rents, it has in effect realized the benefit of the rental collateral, which payment is to be applied to reduce the debt accordingly. *See In re Oaks Partners, Ltd.,* 135 B.R. 440, 451 (Bankr. N.D.Ga.1991) (*"Oaks Partners "*). The debt or claim remains the same.

## ADEQUATE PROTECTION PAYMENTS

■ When a secured creditor has an interest in all of the Debtor's assets, it is common practice to have a hearing early in the case to determine what, if any, adequate

protection payment should be made to the creditor. Unless it is apparent that the secured creditor is obviously oversecured and has a substantial equity cushion, adequate protection payments are often awarded to the secured creditor. The purpose or intent of granting adequate protection payments are to maintain the status quo for that creditor and to protect the creditor from diminution or loss of the value of its collateral during the ongoing Chapter 11 case. If that creditor is oversecured or if there is no reason to believe that the collateral will diminish, then adequate protection payments may not be granted. When adequate protection payments are granted, in the event that the value of the collateral decreases, and the secured creditor cannot realize the full value of the collateral to support its claim as of the date of the filing of the petition, it may keep the adequate protection payments since it was intended that these payments protect the secured creditor from loss. However, unless there is a diminution in the value of the creditor's interest, *i.e.* its collateral, the adequate protection payments should be applied to reduce the debt.

▌ The Court finds the reasoning in *Oaks Partners* persuasive. In *Oaks Partners,* the Court determined whether the net rent payments made post-petition to the bank were to be applied to the debt or whether they were to be applied towards adequate protection of the security interest in the rents. As in our case, the rents have been used to maintain and operate the property in accordance with the bank's consent, and all excess funds have been turned over to the bank. The Court correctly took into consideration the rights of the parties in the event that no bankruptcy petition had been filed:

> It is important to recognize that absent bankruptcy, if a creditor such as First Union enforced its assignment of rents and took possession of the rents without foreclosing, it would still need to apply those rents to the debt as it existed at the time the rents were received. The only way First Union could collect the rents and not apply them to the debt would be to foreclose and become the owner of the proper-

ty before collecting rents. However, the bankruptcy filing invokes the automatic stay which prevents the creditor from foreclosing. If (the bank) is allowed to keep the rents and not apply them to the debt, then one of the purposes of the automatic stay is defeated. In effect, allowing (the bank) to take their rents and not apply them to the debt amounts to a retroactive granting of relief from the stay.

*Id.* at 450.

In other words, turning over the net rents to Coolidge without any reduction of Coolidge's claim would in effect vitiate the automatic stay. This could not have been the intent of Congress when Section 522 was enacted.

In addition, if the Court were to permit Coolidge to retain the net rents without applying them to reduce the debt while Coolidge is undersecured, Coolidge's claim would never decrease, to the detriment of the Debtor's reorganization efforts and the remaining creditors. The payments would drain the Debtor's estate, and the allocation of loss to the remaining creditors would amount to a windfall to Coolidge by paying them more than the amount of the original claim.

### WHETHER THE SECURED CREDITOR IS ENTITLED TO INTEREST WHEN IT HAS A LIEN ON A CHANGING COLLATERAL BASE

▌ When a secured creditor has an interest in future rents, it has an interest in the collateral that arises when it is earned. This additional collateral is still only collateral for the original debt. The funds earned are not property of the secured creditor, but are its added collateral to support the secured creditor's obtaining the full benefit of its claim. In this case, the Debtor has already paid the additional net income from the rents to Coolidge so that the undersecured portion of its claim has already been repaid. From this point in time, Coolidge is no longer undersecured and the continuing net rental payments, although called cash collateral payments, now result in reducing the secured portion of Coolidge's claim, and Coolidge is oversecured.

■ If the Court were to continue to allow the Debtor to apply the net rents received by Coolidge to reduce its claim without the payment of interest, then the longer the Debtor stays in bankruptcy, the further Coolidge's claim would be reduced, by not providing Coolidge with the interest it is now entitled to. This would result in a windfall to the Debtor just as surely as deeming the receipts of all net rents a "wash" would result in a windfall to Coolidge. Neither one is correct.

In this case, Coolidge is now entitled to interest on the defaulted payments which it has not received. The Debtor's plan has recognized this and has offered to pay interest on the arrears.

■ In order to read the various sections of the Code, *i.e.*, §§ 502, 552 and 1129 together in harmony, it is abundantly clear that these sections must be applied in the context of a Chapter 11 case where the ultimate goal is reorganization. Therefore, the Court finds that the cash collateral payments received by Coolidge in excess of full payment of its undersecured claim shall be applied both to reduce the remaining secured claim and towards interest that now commences to accrue on the remainder of the defaulted claim. As a result, neither Coolidge nor the Debtor shall be the sole beneficiaries of the rents generated by the Property and any incentive for either party to delay the proceedings is neutralized. This approach strikes an equitable balance between the Debtor's goal of reorganization and the competing interest of adequately protecting Coolidge's rights as a secured creditor with a perfected lien on the property and on future rents.

■ In this case Coolidge, having received net rental payments from the Debtor over and above its undersecured claim, no longer has an unsecured claim and may not vote in that class. Therefore, the Debtor will be permitted to attempt to obtain the consent of the unsecured class. In addition, the Debtor's Plan appropriately provides for payment of interest on the defaulted portion of its claim, and therefore Coolidge's request that this Court find that the Debtor has not presented a confirmable plan is denied.

## CONCLUSION

1. This Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 152(a).

2. This is a core matter under 28 U.S.C. § 157(b)(2)(L).

3. The Court finds that the Debtor appropriately allocated the net rents received by Coolidge towards the reduction of the undersecured portion of Coolidge's claim. It appears that payments already made have reduced Coolidge's original claim and has eliminated any undersecured claim. However, from the point in time that the net rents received by Coolidge equal or exceed the undersecured portion of Coolidge's claim, the subsequent cash collateral payments shall be applied towards reduction of the remaining secured debt, and towards interest that now commences to accrue on any unpaid portion of Coolidge's secured claim.

4. Coolidge's request that the Disclosure Statement not be approved because it is unconfirmable is denied.

5. The Debtor's June 30, 1994 Disclosure Statement is capable of confirmation and is hereby approved.

Settle an order in accordance with this Decision.