**In re RIVER VILLAGE ASSOCIATES, a Delaware Limited Partnership, Debtor.**

**Bankruptcy No. 92–15503S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Oct. 29, 1993.

128

Kenneth S. Goodkind, Fellheimer, Eichen & Braverman, P.C., Philadelphia, PA, for debtor.

Stephen M. Lyons, III, Reed Smith Shaw & McClay, Philadelphia, PA, Irving Sulmeyer, Sulmeyer, Kupetz, Baumann & Rothman, Los Angeles, CA, for GECC.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Presently before this court in the voluntary Chapter 11 bankruptcy case of RIVER

VILLAGE ASSOCIATES ("the Debtor") are (1) the Debtor's request that we confirm its Fourth Amended Plan of Reorganization Dated July 9, 1993 ("the Debtor's Plan"), over the opposition of the Debtor's only secured lender, General Electric Capital Corporation ("GECC"); (2) GECC's request that we confirm its competing Second Amended Plan of Reorganization ("GECC's Plan") over the Debtor's opposition; and (3) GECC's motion for relief from the automatic stay, or, alternatively, for adequate protection ("the Stay Motion").

We hold that the Debtor's Plan is confirmable, finding that, despite the decision in *General Motors Acceptance Corp. v. Jones,* 999 F.2d 63 (3rd Cir.1993), it is permissible to apply the Debtor's proposed risk free rate plus a premium of nine (9%) percent per annum in the instant situation in light of evidence that GECC does not presently make loans similar to the terms of the loan it is required to make under the Debtor's Plan. However, we also hold that GECC's Plan is confirmable. Since we are permitted to confirm only one plan, we have determined that GECC's plan should be confirmed, because it has greater creditor support and does not frustrate the public policy of preferring reorganizational efforts which will preserve going businesses and aid the economy. Consequently, the Stay Motion is moot and we need not address it.

## B. PROCEDURAL HISTORY

The Debtor filed the underlying bankruptcy case on September 11, 1992 ("the Petition Date"). The Debtor is a limited partnership which owns a single asset: an apartment complex known as River Village Apartments, located at 2610 Philadelphia Turnpike, Claymont, Delaware ("the Property"). The Debtor and GECC have both presented testimony that the Property needs significant repairs. They also agree that the clientele of the Property is "blue collar workers," historically consisting of many employees at the Philadelphia Navy Yard, which is itself threatened with closure.

On or about May 28, 1988, the Debtor acquired the Property from the Najjar Group ("Najjar"). The Debtor, Najjar, and GECC entered into a Note and Mortgage Assumption Agreement pursuant to which the Debtor assumed Najjar's obligations (1) under a $7,000,000.00 Promissory Note, dated April 27, 1988, to GECC ("the Note"); (2) a Mortgage and Security Agreement to GECC constituting a first lien on the Property; (3) an Assignment of Rents and Leases, dated April 27, 1988, to GECC encumbering the Property ("the Assignment of Rents"); and (4) certain other loan documents incidental thereto. The Note was subsequently amended on October 30, 1990, and December 30, 1990.

The Note, as amended, matures on April 30, 1995, and bears interest at a rate of one and five-eighths (1⅝%) percent per annum in excess of the higher of GECC's commercial paper rate or the prime rate ("the Contract Rate"). GECC contends that the Debtor was required to make payments as if the Note bore interest at eleven (11%) percent on the Petition Date. However, as of the hearing of June 2, 1993, *see* page 130 *infra,* GECC's agent conceded that, at that time, the effective interest rate was 7.625 percent. Also, it is important to note that, on the Petition Date, the Debtor was collecting the rents on the Property.

On October 14, 1992, GECC filed the Stay Motion. On December 10, 1992, we entered an order ("the December Order") granting GECC relief from the automatic stay only for the purposes of initially filing any action that it could take under the applicable loan documents and applicable state law ("the Limited Relief"). The Limited Relief prevented GECC from executing upon any foreclosure judgment obtained if the Debtor, on or before February 18, 1993, filed a plan of reorganization and obtained a written commitment from a non-insider third party to finance proposed repairs and improvements to the Property. Since entering the December Order, we have extended the Limited Relief several times, and it remains in effect pursuant to an Order dated June 29, 1993.

After obtaining the Limited Relief, GECC filed a complaint for appointment of a receiver and a complaint to foreclose the mortgage in Delaware state court. GECC also sent a letter to all tenants of the Property notifying them to pay rents directly to GECC.

In response to GECC's latter action, the Debtor, on January 11, 1993, filed a motion for reconsideration of the December Order and to hold GECC in contempt. After a colloquy of January 13, 1993, in which we informed GECC's counsel that the December Order should not have been interpreted as allowing GECC to demand rent payments from the tenants, we entered an order of January 14, 1993, requiring the Debtor and GECC to send a joint letter to the tenants advising them to once again pay their rents to the Debtor.

The Debtor filed its first plan of reorganization and disclosure statement on January 8, 1993. Since that time, the Debtor has amended its plan three times and its disclosure statement twice.

On June 2, 1993, we conducted a lengthy hearing to consider confirmation of the Debtor's Third Amended Plan ("the 3rd Plan"). After extensive post-hearing briefing, we issued an Order/Memorandum of June 19, 1993, reported at 1993 WL 243897 ("the Memo"), denying confirmation of the 3rd Plan for the following reasons: (1) the value of the Property was $3,250,000, not the $2,500,000 figure that the Debtor claimed it was and assumed that it was in determining the amount of GECC's secured claim in the 3rd Plan. Slip op. at *1; (2) the interest rate necessary to provide GECC with the present value of its secured claim was at least nine (9%) percent, not eight (8%) percent, as proposed in the 3rd Plan. *Id.* at *2; (3) it was unclear how the tenants' priority claims for security deposits were being treated and, therefore, a reballoting of the tenants holding such claims was necessary. *Id.*; and (4) an attempt to obtain releases of general partners from creditors who did not affirmatively agree to such releases was inappropriate. *Id.* at *3. The Memo also (1) continued the Stay Motion on the condition that the Debtor file a Fourth Amended Plan and an accompanying Amended Disclosure Statement on or before July 9, 1993. *Id.* at *1; (2) required the Debtor to resolicit plan votes. *Id.*; and (3) denied GECC's motion to sequester rents because we doubted whether, under applicable Delaware law, GECC had a valid security interest in the rents. *Id.* at *5–*6.

In accordance with the Memo, the Debtor filed the Plan before us for consideration and an accompanying Third Amended Disclosure Statement on July 9, 1993. However, on the previous day, July 8, 1993, GECC had also filed a plan and disclosure statement.

On July 21, 1993, we summarily denied a motion of the Debtor to "clarify" the Memo in such a fashion as to interpret it as an extension of the Debtor's exclusivity period, which had otherwise expired. We stated that, in issuing the Memo, we did *not* mean to extend the Debtor's exclusivity period nor preclude GECC from filing a competing plan.

Hearings on the Disclosure Statements accompanying both Plans were scheduled on August 4, 1993. Both parties filed Objections to the Disclosure Statements of the other. GECC filed the instant Plan and an Amended Disclosure Statement in response to the Debtor's Objections to its original Disclosure Statement on August 4, 1993. On August 5, 1993, we entered orders approving each of the parties' respective Disclosure Statement, and scheduling confirmation hearings on both Plans on September 22, 1993.

On the latter date, we conducted a brief consolidated hearing regarding confirmation of both Plans, supplemental to the extensive hearing of June 2, 1993, relating to confirmation of the Debtor's 3rd Plan. After the hearing, on September 23, 1993, we entered an Order granting the parties an opportunity to simultaneously file Opening Briefs supporting their own plans and opposing those of the other party by October 1, 1993, and Reply Briefs addressing the same issues by October 8, 1993.

## C. *A DESCRIPTION OF THE COMPETING PLANS, THE VOTING THEREON, AND THE OBJECTIONS THERETO*

The key difference between the Plans in issue is their treatment of (1) the tenants' claims for security deposits; (2) GECC's claim; and (3) the partners' equity interests in the Debtor. In describing the Plans, we will focus on their treatment of these claims.

The tenants have claims against the Debtor for their security deposits. The first $900

of each of these claims is arguably a sixth priority claim pursuant to 11 U.S.C. § 507(a)(6).

GECC's total claim against the Debtor is $6,746,564. In the Memo, this court determined that the value of the Property securing the GECC's claim is $3,250,000. Accordingly, GECC has a secured claim of $3,250,000 and an unsecured claim in the amount of $3,496,564.

### a. THE DEBTOR'S PLAN

The Debtor's Plan basically corrects the deficiencies that prevented confirmation of the 3rd Plan. It includes the tenants' allowed claims for security deposits in Class 3 to the extent they are priority claims pursuant to 11 U.S.C. § 507(a)(6). The tenants have an option with respect to these claims. Each tenant may elect to have ninety (90%) percent of the claim paid in cash on the effective date or as soon as practicable thereafter. The claims of tenants who do not make this election will be paid in full, in equal annual installments, over three years, with interest at an annual rate of five (5%) percent.

GECC's allowed secured claim comprises Class 4. This claim is fixed at $3,250,000. Beginning on the effective date, this claim will accrue interest at an annual rate of nine (9%) percent. During the first five years of the plan, the Debtor will make only annual interest payments on this claim. Beginning in the sixth year and continuing until the fifteenth year, the Debtor will make principal and interest payments based on a twenty-five (25) year amortization schedule. Thirty (30) days after the fifteenth year, the Debtor will make a cash payment equal to the balance of this claim.

The allowed unsecured claims (including GECC's allowed deficiency claim) comprise Class 5. The Debtor will pay allowed unsecured claimants ten (10%) percent of their claims over an eight year period. These payments will begin on the second anniversary of the effective date.

The limited partnership interests in the Debtor comprise Class 6, and the general partnership interests in the Debtor comprise Class 7. The Debtor's Plan proposes that the Debtor's limited and general partners will make a $350,000 contribution to the Debtor's capital ("the Partners' Contribution"). The holders of limited partnership interests who pay their proportionate shares of the Partners' Contribution will receive an equivalent limited partnership interest in the reorganized debtor. The holders of limited partnership interests who do not make such payments shall be deemed to have transferred their limited partnership interests to the general partner (or its nominee), and the general partner will be substituted for such limited partners and hold their limited partnership interests. In return, the general partner is obliged to pay the said limited partners' proportionate share of the Partners' Contribution. Holders of the general partnership interests who pay their proportionate shares of the Partners' Contributions, as general partners, will receive equivalent general partnership interests in the reorganized Debtor.

The Debtor anticipates that its Plan will be funded by the Partners' Contribution and the cash flow from operations.

### b. GECC'S PLAN

GECC's Plan is essentially a liquidating plan. In GECC's Plan, the tenants' allowed claims for security deposits are included in Class 2 to the extent they are priority claims pursuant to 11 U.S.C. § 507(a)(6). The tenants have an option with respect to these claims. Each tenant may elect to leave the lease unaltered and have the security deposit claim paid in accordance with the terms set forth in the tenant's lease. With respect to tenants that do not make this election and do not agree to less favorable treatment, GECC will pay each of these claims in full on the later of (1) the date it becomes allowed; or (2) the effective date of the Plan.

GECC's allowed claim comprises Class 4. Its Plan provides that, immediately following the confirmation of that Plan, the Property will be sold and GECC's allowed secured claim will be paid from the net proceeds of the sale. GECC or an entity designated by it as a bidder on its behalf ("the GECC Agent") may "credit bid" up to the allowed amount of GECC's claim, or the GECC

Agent may bid to acquire the Property subject to GECC's existing liens.

The allowed unsecured claims comprise Class 5. Unless a claimant agrees to less favorable treatment, GECC will pay each of these claims in full on the later of (1) the date each claim becomes allowed; or (2) the effective date.

The holders of limited and general partnership interests ("the Interest Holders") in the Debtor comprise Class 6. GECC is guaranteeing that a total of at least $50,000 will be paid to the Interest Holders. Additionally, the Interest Holders are entitled to any balance remaining after the creditors in Classes 1 through 5 have been paid in full.

GECC anticipates that its Plan will be funded by the Debtor's cash on hand on the effective date and the proceeds from the sale of the Property. To the extent that these funds are insufficient, GECC will guarantee payment of all allowed claims in Classes 1, 2, 3 and 5 and an aggregate payment of $50,000 to the Interest Holders.

### c. VOTES ON THE PLANS

All of the Class 3 claimants (tenants) who voted accepted the Debtor's Plan. All but one of twelve (12) members of Class 6 (limited partners) who voted, holding over ninety-five (95%) percent of the total of these claims, accepted the Plan, as did the two voting members of Class 7 (general partners). GECC's votes resulted in a rejection of the Plan as to Class 4 (secured claims) and Class 5 (unsecured claims).

GECC reported that Classes 2 and 5 were deemed to have accepted its Plan. It cast the sole vote in Class 4 in favor of acceptance. Eighteen (18) out of nineteen (19) members of Class 6 (interest holders) rejected the GECC Plan.

### d. OBJECTIONS TO THE PLANS

Many of GECC's objections to the Debtor's Plan are similar to the objections it had to the 3rd Plan. Except as otherwise stated in the Memo, we rejected most of these

objections when ruling on the 3rd Plan. Thus, we do not believe it is necessary to reconsider those objections that we previously determined lacked merit.[1]

However, GECC has raised the following three new objections to the Debtor's Plan that must be considered: (1) the tenants' claims for security deposits should not be included in Class 3 and, if these claims are not part of Class 3, no impaired class has accepted the plan; (2) the plan improperly permits the Debtor to use the rents in light of the intervening decision in *Commerce Bank v. Mountain View Village, Inc.,* 5 F.3d 34 (3rd Cir.1993); and (3) the interest rate on GECC's secured claim is too low in light of another intervening decision, *General Motors Acceptance Corp. v. Jones,* 999 F.2d 63 (3rd Cir.1993). We will discuss each of these objections in turn.

The Debtor's Objections to the GECC Plan appear to be as follows: (1) the Debtor's Plan must be confirmed and, if so, GECC's Plan cannot be confirmed. *See* 11 U.S.C. § 1129(c); (2) if both plans are deemed confirmable, the Debtor's Plan must be preferred because it is a reorganizational plan rather than a liquidating plan; (3) GECC has impermissibly modified its Plan by identifying, for the first time at the confirmation hearing, General Electric Credit Equities ("GECE"), a GECC affiliate, as the proposed bidder for the Property, which intends to manage and repair it; (3) GECC has prepared its Plan in bad faith and has acted in bad faith by previously sending the notices to the tenants demanding that rents be paid to it, seeking foreclosure, and trying to bid its full debt for the Property; (4) Class 2 (tenants) is impaired, and its members were therefore improperly denied an opportunity to vote; (5) GECC's vote on its Plan is that of an "insider," which cannot be counted, resulting in the absence of an accepting class; and (6) violations of 11 U.S.C. §§ 1129(a)(4), (a)(5).

---

1. Of note were our holdings that (1) the Debtor's treatment of the tenants' claims constituted an impairment of their claims, and this impairment was not "artificial." *Memo, supra,* slip op. at *3–*4; (2) the plan satisfied the "new value exception" to the "absolute priority rule." *Id.* at *5; and (3) GECC's interests in the Debtor's rents did not preclude the Debtor from utilizing the rent proceeds in effectuating its plan. *Id.* at *5–*6.

In our following legal discussion, we will first address what we deem are significant issues regarding confirmability of the Debtor's Plan. Then, we will pass to brief discussions of what we perceive as weak arguments in opposition to GECC's Plan. Finally, since we find both Plans potentially confirmable, we will discuss our reasons for preferring the GECC Plan.

## D. CONCLUSIONS OF LAW/DISCUSSION

### 1. THE DEBTOR'S PLAN PROPERLY TREATS THE TENANTS' DEPOSITS AS PRIORITY CLAIMS PURSUANT TO 11 U.S.C. § 507(a)(6).

■ GECC claims that the tenants' claims for security deposits are not 11 U.S.C. § 507(a)(6) priority claims and, therefore, the Debtor improperly included these claims in Class 3. We should note at the outset that we are troubled by the fact that this contention regarding the status of the security deposits was not previously made by GECC, and appears inconsistent with its earlier contention that the tenants held § 507(a)(6) claims which were either unimpaired or impermissibly "artificially" impaired. We are therefore disinclined to give the objection any consideration.

However, assuming *arguendo* that we did so, we find this objection lacking on merits. The Code section in issue, 11 U.S.C. § 507(a)(6), provides as follows:

(a) The following expenses and claims have priority in the following order: ...

. . . . .

(6) Sixth, allowed unsecured claims of individuals, to the extent of $900 for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental of property, or the purchase of services, for the personal, family, or household use of such individuals, *that were not delivered or provided* (emphasis added).

GECC alleges that the tenants' claims for security deposits are not § 507(a)(6) priority claims because they arise in connection with rental property that has already been delivered and provided, and hence do not fall within § 507(a)(6) in light of the language emphasized above.

Section 507(a)(6) was designed to protect consumers who had deposited money for goods and services with a business that subsequently filed for bankruptcy. *See* H.R.REP. NO. 595, 95th Cong., 1st Sess. 188 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787 ("the House Report"). Before this section was enacted, a consumer that paid money on a layaway plan or as a deposit on merchandise, or that bought a contract for future services (such as a gym membership or service contract), was a general unsecured creditor of the business if it later filed for bankruptcy. Although the consumers' deposits were tantamount to trust fund payments, the consumers often got nothing from the debtor's estate because the assets available provided little return to the unsecured creditors. Because of consumers' ignorance and inability to bargain with a retail merchant, they were typically unable to do a credit investigation or obtain special terms from the merchant, as a more sophisticated and larger creditor might do.

Section 507(a)(6) was enacted to remedy this problem and to recognize that consumer creditors are different than business creditors. By giving each individual consumer deposit creditor a sixth priority for claims up to $900, it was believed that these would be assets available to pay a consumer creditor's claims in many situations. *Id.*

The legislative history does not discuss a tenant's claim for a security deposit. However, the statute appears, on its face, to cover any pre-petition deposits in connection with the lease or rental of property that were not delivered or provided.

GECC's position is that, once the tenants were given possession of their leaseholds, they no longer had priority claims for their security deposits. However, if we were to adopt this position, § 507(a)(6) would be limited to protect tenants only if a landlord filed bankruptcy between the time the security deposit was paid and the time the tenant got possession of the rental premises. In consumer leases this time period would be short, if it existed at all. We do not believe

§ 507(a)(6) was intended to give such limited protection.

GECC relies on *In re Cimaglia*, 50 B.R. 9 (Bankr.S.D.Fla.1985), in support of its position. However, in *In re Wise*, 120 B.R. 537, 547 (Bankr.D.Ala.1990), the court determined that the decision in *Cimaglia* "that a non-commercial tenant's rent deposits does not fall within Section 507(a)(6) is contrary to the plain wording of the statute." We believe that the observations in the *Wise* decision are correct, and we will follow that court's interpretation of § 507(a)(6), as opposed to that proposed by *Cimaglia*.

Since we therefore do not believe that § 507(a)(6) was intended to give only the limited protection to consumer creditors suggested by GECC, we hold that the first $900 of each tenant's claim for security deposits is a § 507(a)(6) priority claim and, therefore, that the Debtor properly included these claims in Class 3.

2. *THE DEBTOR'S PLAN DOES NOT IMPROPERLY PERMIT THE DEBTOR TO USE THE PROPERTY'S RENTS.*

■ In the Memo, slip op. at *5–*6, we determined that GECC did not take any prepetition or post-petition action that created a valid lien on the rents paid to the Debtor by its tenants. GECC argues that, in light of the intervening controlling decisions in *Mountain View*, *supra*, this court should reconsider its previous position as to whether it has a valid security interest in rents, and we should find that GECC in fact has a valid security interest in the Property's rents.

However, we believe that *Mountain View* is not applicable to the instant proceeding for two reasons. First, it analyzed a mortgagee's rights to receive rents under Pennsylvania law. In this case, at issue is a mortgagee's rights under Delaware law. The *Mountain View* court makes several references to Pennsylvania decisions which have no Delaware law analogues in rendering its decision. *Id.* at 37–38. Nothing in *Mountain View* suggests that, apart from these Pennsylvania decisions, the "American common law rule," as applied in *Teal v. Walker*, 111 U.S. 242,

248–51, 4 S.Ct. 420, 423–25, 28 L.Ed. 415 (1884), should not control.

Second, in *Mountain View* the mortgagee had served notice on the tenants and was collecting the rents before the bankruptcy petition was filed. The court specifically noted that it was not "[e]xplor[ing] the controversy that arises when the mortgagee does not make a demand on the tenants to enforce its rights until after the petition for bankruptcy has been filed." *Id.* at 38. The instant case involves the exact controversy that *Mountain View* acknowledged that it was not exploring because, in this case, GECC did not serve notice on the tenants before the Petition Date.

This court's adherence to its holding in the Memo is also consistent with the doctrine of the "law of the case." As we stated in *In re Cole*, 89 B.R. 433, 436 (Bankr.E.D.Pa.1988), the "law of the case" is defined as

the refusal of courts to reopen what has already been decided by them. *See, e.g., Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983); *Messenger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912); *Cowgill v. Raymark Industries, Inc.*, 832 F.2d 798, 802–04 (3d Cir.1987); and *Zichy v. Philadelphia*, 590 F.2d 503, 508 (3d Cir.1979). While we recognize that this doctrine should not constitute a mandate to adhere to a previous erroneous decision, we believe that the doctrine should cause a court to change a prior ruling in a case only where that ruling is "clearly erroneous" and it "would work a manifest injustice" to adhere to it. *Arizona v. California*, *supra*, 460 U.S. at 618 n. 8, 103 S.Ct. at 1931 n. 8; *Schultz v. Onan Corp.*, 737 F.2d 339, 345 (3d Cir. 1984); and *Swietlowich v. County of Bucks*, 610 F.2d 1157, 1164 (3d Cir. 1979)....

We do not believe that our ruling in the Memo as to the rents issue was "clearly erroneous," nor would it "work a manifest injustice" upon GECC, irrespective of the intervening *Mountain View* decision. Therefore, we reaffirm the conclusion set forth in the Memo, *i.e.*, that GECC does not

have a valid security interest in the rents generated from the Property.

3. *SINCE NO MARKET FOR LOANS SIMILAR TO THE PROPOSED CRAMDOWN OF GECC'S SECURED CLAIM EXISTS, THE INTEREST RATE ON GECC'S SECURED CLAIM WAS PROPERLY · ESTAB-LISHED AT NINE (9%) PERCENT, BASED ON THE TREASURY BILL RATE PLUS A RISK FACTOR; THE DEBTOR'S PLAN IS THERE-FORE CONFIRMABLE.*

■■■ GECC argues that the nine (9%) percent rate proposed by the Debtor to be paid on its secured claim is insufficient and does not provide it with the present value of its claim as required under 11 U.S.C. § 1129(b)(2)(A). A court may confirm a Chapter 11 debtor's plan of reorganization over the objections of creditors, *i.e.*, it may "cram down" a plan upon its creditors. The Bankruptcy Code, at 11 U.S.C. § 1129(b), sets forth the requirements that must be satisfied in order for the court to utilize its cram down powers to confirm a plan. It mandates that, in certain instances, pay-ments under a plan must be "of a value, as of the effective date of the plan, equal to the allowed amount of the claim." 11 U.S.C. §§ 1129(b)(2)(A)(i)(II), 1129(b)(2)(B)(i), and (C)(i). The legislative history of § 1129 ex-plains that, in order to determine the value "as of the effective date of the plan," the payments proposed in the plan must be dis-counted to the present value as of the effec-tive date of the plan. House Report, *supra*, at 414–15, U.S.Code Cong. & Admin.News 1978, p. 6370. *See also In re Orfa .Corp. of Philadelphia*, 129 B.R. 404, 418 (Bankr. E.D.Pa.1991).

A present value analysis is based ·on the timing, number, and amount of payments; the interest rate; and the discount rate. Only when the discount rate equals the inter-est rate will the aggregate payments over the payment period equal the present value of the claim. House Report, *supra*, at 414; and *In re Burgess Wholesale Mfg. Opticians, Inc.*, 721 F.2d 1146, 1147 (7th Cir.1983). The issue before this court is how to determine the appropriate interest rate to use in a present value analysis under Section 1129(b)(2)(A)(i)(II).

The present value language in § 1129(b)(2)(A)(i)(II) is virtually identical to the present value language appearing in sev-eral other sections of the Bankruptcy Code. *Compare* 11 U.S.C. §§ 1129(a)(7)(A)(ii) and (C), 1129(a)(9)(B)(i) and (C), *with* 11 U.S.C. §§ 1225(b)(1)(A), 1225(a)(5)(B)(ii), 1325(a)(4), 1325(a)(5)(B)(ii) and 1325(b)(1)(A). Thus, cases analyzing the appropriate interest rate in a present value analysis under any of these sections are instructive. *But see In re 222 Liberty Associates*, 108 B.R. 971, 995 n. 16 (Bankr.E.D.Pa.1990) (it may be appropri-ate to apply more· of a consumer-oriented vantage point when applying 11 U.S.C. § 1325(a)(5)(B)(ii) in a consumer mortgage setting, as opposed to applying § 1129(a)(2)(A)(i)(II) in a business setting).

The Bankruptcy Code and its legislative history provide little guidance on how to determine the appropriate interest rate in a present value analysis. Further, courts ad-dressing the issue have applied different ra-tionales and reached different results when deciding the appropriate interest rate, includ-ing: (1) the current market rate for similar loans (the coerced loan approach). *See, e.g., Jones, supra*, 999 F.2d at 70 (the interest ·rate under 11 U.S.C. § 1325(a)(5)(B)(ii) is that which the secured creditor would charge for a loan similar in character, amount and duration to the loan which the creditor is required to make under the plan); *United Carolina Bank v. Hall*, 993 F.2d 1126, 1130–31 (4th Cir.1993) (the interest rate in Chap-ter 13 cram down should be the lesser of the contract rate or the rate that secured credi-tor would otherwise be able to obtain in its lending market adjusted for expenses in ob-taining such a loan); *In re Hardzog*, 901 F.2d 858, 860 (10th Cir.1990) (absent special cir-cumstances, such as the market rate being higher than the contract rate, the proper interest rate to be used in a Chapter 12 present value analysis is the current market rate of interest used for similar loans in the region); *United States v. Arnold*, 878 F.2d 925 (6th Cir.1989) (the interest rate under 11 U.S.C. § 1225(a)(5)(B) is the market rate for

similar loans in the region); *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427 (6th Cir.1982) (absent special circumstances, the interest rate under 11 U.S.C. § 1325(a)(5)(B) is the current rate for similar loans in region); and *In re Shannon,* 100 B.R. 913, 939 (S.D.Ohio 1989) (the appropriate method for setting an .interest rate under 11 U.S.C. § 1225(a)(5)(B)(ii) is to ascertain the market rate for similar loans among regional and local lenders); (2) the rate the creditor must pay to replace the funds (the cost of funds approach). *See, e.g., In re Jordan,* 130 B.R. 185, 190 (Bankr.D.N.J.1991) (the cost of funds approach should be used to determine interest rate in a Chapter 13 present value analysis); and *In re Campbell,* 16 B.R. 496, 497 (Bankr.N.D.Ill.1982) (the interest paid to a secured creditor in a Chapter 13 plan should be whatever rate the creditor would be required to pay to obtain monies). *But see Jones, supra,* 999 F.2d at 69 (criticizing the cost of funds approach); and *Hall, supra,* 993 F.2d at 1130 (same); (3) the "risk-free rate" (which is based on treasury obligations or the prime rate, plus an additional premium for risk). *See e.g. In re Fowler,* 903 F.2d 694, 696–98 (9th Cir.1990) (the proper interest rate in a Chapter 12 cram down is the prime rate or the rate on treasury obligations plus a risk factor); *United States v. Doud,* 869 F.2d 1144, 1145 (8th Cir.1989) (the market rate approach should be utilized to determine the interest rate in Chapter 12 cram down, measured by the rate on treasury bonds plus a 2% risk premium); *In re Camino Real Landscape Maintenance Contractors,* 818 F.2d 1503, 1508 (9th Cir.1987) (the rate of interest on treasury obligations plus a risk factor was used to determine present value of tax claim under § 1129(a)(9)(C)); *In re Venture Capital L.P.,* Bankr. No. 91–13035F, slip op. at 24 (Bankr. E.D.Pa. Feb. 16, 1993) (a treasury bill rate plus a proposed risk premium was held to yield a sufficient interest rate under 1129(b)(2)(A)(ii)); *In re Westwood Plaza Apartments,* 147 B.R. 692, 701 (Bankr. E.D.Tex.1992) (the appropriate interest rate in Chapter 11 cram down was prime rate plus a risk factor); *In re Computer Optics, Inc.,* 126 B.R. 664, 672 (Bankr.D.N.H.1991) (same); and *In re Mitchell,* 77 B.R. 524, 529 (Bankr.E.D.Pa.1987) (this court establishes the appropriate measure of the interest rate under § 1325(a)(5)(B)(ii) or § 1129(a)(9)(C) as the lesser of the contract rate, or the Treasury bill rate plus one (1%) percent, unless the parties present evidence to the contrary); (4) the interest rate in the original contract. *See, e.g., In re Cooper,* 11 B.R. 391, 394 (Bankr.N.D.Ga.1981) (absent evidence to the contrary, there is a presumption that the contract rate is the appropriate rate under 11 U.S.C. § 1325(a)(5)(B)(ii)); and *In re Smith,* 4 B.R. 12, 13 (Bankr.E.D.N.Y.1980) (absent evidence to the contrary, the discount rate and the contract rate are the same). *Cf. Mitchell, supra,* 77 B.R. at 529 (the lesser of the contract rate or the Treasury Bill rate is applied); (5) the IRS judgment rate set forth in 26 U.S.C. § 6621. *See, e.g., In re Strong,* 12 B.R. 221 (Bankr.W.D.Tenn.1981) (a Chapter 13 debtor was required to pay interest at the rate set forth in 26 U.S.C. § 6621); and *In re Crotty,* 11 B.R. 507, 510 (Bankr. N.D.Tex.1981) (the interest rate established in 26 U.S.C. § 6621 is the appropriate rate to pay on a Chapter 13 tax claim); (6) the statutory judgment rate. *See, e.g., In re Marx,* 11 B.R. 819, 822 (Bankr.S.D.Ohio 1981) (a Chapter 13 debtor was required to pay a creditor interest at the statutory judgment rate); and (7) the Treasury Bill rate without a risk factor. *See, e.g., In re Mitchell,* 39 B.R. 696, 702 (Bankr.D.Ore.1984) (the treasury bill rate was the proper rate for a Chapter 13 debtor to pay on tax claim); and *In re Jewell,* 25 B.R. 44 (Bankr.D.Kan.1982) (the treasury bill rate was the proper rate for Chapter 13 debtor to pay secured creditors).

In *Jones, supra,* 999 F.2d at 70, which is of course controlling on this court if applicable, the court endorsed the coerced loan approach in the context of a Chapter 13 cram down, holding "that the rate of interest under § 1325(a)(5)(B)(ii) is that which the secured creditor would charge, at the effective date of the plan, for a loan similar in character, amount and duration to the credit which the creditor will be required to extend under the plan."

*Jones* involved two cases in which each of the debtors had purchased pickup trucks from General Motors Acceptance Corpora-

tion ("GMAC") and subsequently filed voluntary Chapter 13 petitions. In both cases, GMAC was undersecured and the respective debtors each proposed a plan reducing the amount of GMAC's secured claim to the value of the collateral and reducing the interest rate to be paid on GMAC's claim to ten (10%) percent. This rate was below the interest rates that the debtors had agreed to pay in their original financing agreements, 11.98% and 13%, respectively. GMAC objected to the proposed interest rate, alleging that ten (10%) percent was too low to provide it with the present value of its secured claim as required by 11 U.S.C. § 1325(a)(5)(B)(ii).

The *Jones* court explained that the purpose of 11 U.S.C. § 1325(a)(5)(B)(ii) is "to put the secured creditor in an economic position equivalent to the one it would have occupied had it received the allowed secured amount [of its claim] immediately." 999 F.2d at 69. The court viewed a Chapter 13 cram down as effectively coercing the creditor to make a new loan. The court explained, *id.* at 67, that

> [i]t is only by acknowledging the coerced loan aspects of a cram down and by compensating the secured creditor at the rate it would voluntarily accept for a loan of similar character, amount and duration that the creditor can be placed in the same position he would have been in but for the cramdown.

Thus, the court held "that the appropriate interest rate under 1325(a)(5)(B)(ii) is the interest rate that GMAC would charge, at the time of the effective date of the plan, for a loan of similar character, amount and duration." *Id.* at 70.

In making its decision, the *Jones* court relied, in part, on the fact that the coerced loan approach provides a practical method for determining the interest rate which reduce the litigational and transactional costs in determining confirmability of Chapter 13 plans. It explained, at *id.*, that

> [w]e believe that in most instances, regularly maintained documents of the creditor should make it possible for the debtor and creditor to stipulate on the interest rate

the creditor would charge for a new loan of similar character, amount and duration.

The *Jones* court supported its result by particular reference to decisions by two other Courts of Appeals, *Hardzog, supra;* and *Whitman, supra.* In *Whitman,* the court held that, in the absence of special circumstances, the current market rate of interest used for similar loans in the region should be used in determining the interest rate under 11 U.S.C. § 1325(a)(5)(B). In *Hardzog,* it was held that, in the absence of special circumstances, such as the market rate being higher than the contract rate, courts should use the current market rate of interest for similar loans in the region in determining present value in Chapter 12.

In making their decisions, both of these courts relied on the fact that the interest rate on similar loans was easily ascertainable. The *Whitman* court reasoned that "[b]ankruptcy courts are generally familiar with the current conventional rates on various types of consumer loans. And where parties dispute the question, proof can easily be adduced." 692 F.2d at 431. The *Hardzog* court explained, 901 F.2d at 860, that

> Bankruptcy Courts, counsel, lenders, and borrowers should have a familiarity with current interest rates on like-type loans and when a dispute arises, the market rate should be easily susceptible of determination by means of a hearing where each party is given the opportunity to submit evidence concerning the current market rate of interest for similar loans in the region.

Because of the ease in ascertaining the interest rate on consumer loans and, in turn, the reduction in transactional and litigation expenses, each of these appellate courts adopted the coerced loan approach.

At first glance, it appears that the coerced loan approach adopted in *Jones* should apply in the instant proceeding. The language in § 1325(a)(5)(B)(ii) that the *Jones* court was interpreting is virtually identical to the language in § 1129(b)(2)(A)(II), which is at issue

in this case.[2] However, we find that the rationale supporting *Jones*, as well as *Memphis* and *Hardzog*, does not apply in the instant case.

As explained above, *Jones* relied on the fact that the interest rate on similar loans was easily ascertainable and, therefore, its ascertainment would reduce the transactional and litigational costs in Chapter 13 cases. This is often true in cases, like *Jones*, involving consumer loans, because there is an existing market where such loans are continuously being made and the interest rates on such loans are often published or advertised.

However, the opposite is true in the situation at issue in the instant proceeding. This case involves a commercial loan on an apartment complex in an economically depressed area. The secured creditor readily admits, and several other courts have recognized, that there are no loans similar to these loans being made at this time. *See In re Ivey*, 147 B.R. 109, 115 (M.D.N.C.1992); *Venture Capital, supra*, slip op. at 24; *In re Eastland Partners Ltd. Partnership*, 149 B.R. 105, 106 (Bankr.E.D.Mich.1992); and *In re Oaks Partners, Ltd.*, 135 B.R. 440, 444–45 (Bankr. N.D.Ga.1991). Thus, the interest rate on loans similar to that at issue to the Debtor's treatment of GECC in its Plan is extremely difficult, and arguably impossible, to ascertain. At a minimum, it could not be determined without the court's adducing substantial testimony regarding what interest rate the creditor would charge on such a loan if it were to make such a loan. Thus, the *Jones* court's goal of reducing transactional and litigation costs is not achieved by applying the coerced loan approach to the commercial real estate loan situation at issue in this case.

Further, application of the coerced loan theory in cases where there is no market for similar loans effectively eliminates the court's cram down powers. *See Eastland, supra*, 149 B.R. at 106 (stating that "[t]o deny con-

firmation just because there is no market for similar loans would give the market permission to repeal § 1129(b)(2) of the Bankruptcy Code"). This is true because the secured creditor could, as GECC attempted to do in this case, present expert testimony that no lender would make a loan which is comparable to the treatment of the creditor under the terms of the plan. The expert would then propose some high interest rate that a lender would require if it were to make such a loan. *See Oaks Partners*, 135 B.R. at 445. It is likely that the proposed rates, representing a loan which the lender would not be prepared to make, would be high enough to render the debtor's plan infeasible. *Id.* If the court accepted this expert testimony, the court could not cram down the proposed plan. This turn of events would significantly reduce the debtor's chances of reorganizing, and unfairly increase the secured creditor's bargaining power during the plan negotiation process.

In summary, unlike *Jones*, application of the coerced loan approach in this case would not have the effect of reducing the transactional and litigation costs. In fact, it would probably increase these costs. Furthermore, it would (1) effectively eliminate the court's cram down powers; (2) reduce the debtor's chance of proposing a successful reorganization; and (3) unfairly increase the creditor's bargaining power during the negotiation process. For these reasons, we cannot apply the coerced loan approach in this case, where there is no market for similar loans.

Having determined that the coerced loan approach is inappropriate, we are still left with the question of how to determine the appropriate interest rate when there is no market for similar loans. The *Jones* court stated, in dictum, that it believed the contract rate could be used "if the creditor fails

---

**2.** Section 1325(a)(5)(B)(ii) states, in relevant part, that

[t]he court shall confirm a plan if ... (5) with respect to each allowed secured claim ... the plan provides that the holder of such claim retain ... *the value, as of the effective date of the plan*, of property to be distributed under the plan on account of such claim *is not less than the allowed amount of such claim....* (emphasis added).

Section 1129(b)(2)(A)(i)(II), meanwhile, provides that

[w]ith respect to a class of secured claims, the plan provides ... (II) that each holder of a claim of such class receive on account of such claim deferred cash payments ... *of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property* (emphasis added).

to come forward with persuasive evidence that its current rate is in excess of the contract rate." 999 F.2d at 70–71.

While we believe that the contract rate should serve as a guide in determining the proper interest rate to be used, we do not think it should be determinative. *See In re Monnier Bros.,* 755 F.2d 1336, 1339 (8th Cir.1985) (court relied on the contract rate when it was negotiated only twenty months before confirmation); *Venture Capital, supra,* slip op. at 27 (although contract rate was not dispositive, it was indicative of risk secured creditor was accepting); and *Oaks Partners, supra,* 135 B.R. at 444 (stating that "[t]he contract rate and the historical relationship between the parties is of relevance to the risk analysis, but the contract rate does not serve as the exclusive measure or as an upper limit on the cramdown interest rate").

■ We believe that the proper interest rate to be used in a present value analysis is the risk-free rate plus an additional premium for risk. *Accord, Eastland Properties, supra,* 149 B.R. at 106–09.

An interest rate is typically based on the following three components: (1) an estimation of future inflation, which protects the lender against loss of purchasing power caused by inflation. W. Scott, *Deferred Cash Payments to Secured Creditors in Cram Down of Chapter 11 Plans: A Matter of Interest,* 63 WASH.L.REV. 1041, 1046 (1988); (2) a "real" rate of interest, which compensates the lender for giving up current use of its funds in exchange for future use. *Id.* It should be noted that "[i]nflationary expectations and the real rate of interest are the same for all borrowers." *Id.;* and (3) a premium for risk. *Id.* As the *Jones* court recognized with respect to a Chapter 13 cram down, a Chapter 11 cram down effectively coerces the creditor to make a new loan. Further, we believe that the purpose of § 1129(b)(2) is the same as the purpose of Section 1325(a)(5)(B): to put the creditor in a position comparable to that which it would have been in if it had received the allowed amount of its secured claim immediately. Since the lender would have received all three of the foregoing interest components if it had entered into the coerced loan outside of bankruptcy, we believe that it should receive the same treatment in the context of a Chapter 11 cram down.

The rate of interest on treasury obligations for a term equal to the payout period proposed in the plan should reflect the proper return on a risk free loan after adjustment for inflation, *i.e.,* it should reflect the first two components of the interest rate. *See Camino Real, supra,* 818 F.2d at 1505–06; and *Eastland, supra,* 149 B.R. at 107. Accordingly, the interest rate on treasury obligations is the starting point in the interest rate determination.

A risk premium must be added to this rate to compensate the lender for the extra risks associated with the coerced loan. The proper risk premium depends on the amount and quality of the collateral, the risk of default, and the length of the payout period. *See Westwood Plaza, supra,* 147 B.R. at 701. The proper amount of this premium is difficult to determine, *see Mitchell, supra,* 77 B.R. at 529, and, at best, must be determined on a case by case basis.

In this case, we already determined the appropriate interest rate. Memo, slip op. at *1. We determined there that the proper interest rate is at least nine (9%) percent, which was based on the Treasury Bill rate of six (6%) percent at the time of the first confirmation hearing plus a risk premium of three (3%) percent. We again note, as we did at page 134 *supra,* that the "law of the case" requires us to adhere to our prior determinations unless they are "clearly erroneous" or "work a manifest injustice" upon any party in light of intervening controlling court decisions. We have carefully reviewed the impact of the *Jones* decision and have concluded that our initial analysis, in the Memo, was not inconsistent with *Jones,* and was appropriate. Since the Debtor's Plan pays GECC interest of nine (9%) percent on its secured claim, as required by the terms of the Memo, we reiterate our conclusion that the Debtor's Plan satisfies the requirements of 11 U.S.C. § 1129(b)(2)(A).

Since we have now concluded that the Debtor's Plan has indeed been modified to

satisfy the problems identified in the Memo and since GECC has not presented any new objections that would prevent confirmation, we hold that the Debtor's Plan satisfies the standards for confirmation. However, GECC has also presented a Plan, and this court can only confirm one plan. 11 U.S.C. § 1129(c). Therefore, we must determine if GECC's Plan also satisfies the standards for confirmation and, if it does, we must decide which of the two Plans should be confirmed.

### 4. NONE OF THE DEBTOR'S OBJECTIONS TO CONFIRMATION OF GECC'S PLAN CAN BE SUSTAINED; THAT PLAN IS THEREFORE ALSO CONFIRMABLE.

The Debtor has asserted several objections to confirmation of GECC's Plan. Each of these will be addressed in turn, although we conclude that none of the plan observes extended treatment and that all of them can be readily rejected.

### a. LACK OF GOOD FAITH

■ First, the Debtor alleges that GECC's Plan is not proposed in good faith because it is a liquidating plan and it enables GECC to buy the Property by credit bidding its claim. This court can indeed confirm a plan only if it is proposed in good faith. 11 U.S.C. § 1129(a)(3).

However, lack of good faith generally references misconduct in the bankruptcy proceedings, such as fraudulent misrepresentations or serious nondisclosures of material facts to the court. *Cf. In re Gathright*, 67 B.R. 384, 387–88 (Bankr.E.D.Pa.1986), *appeal dismissed*, 71 B.R. 343 (E.D.Pa.1987) (Chapter 13 case). GECC is not guilty of fraudulent misrepresentations or serious nondisclosures of material facts simply because it has proposed a liquidating plan that enables it to credit bid for the Property. The Bankruptcy Code specifically provides for liquidating plans. 11 U.S.C. § 1123(b)(4). Further, absent cause, GECC is permitted to credit bid the full amount of its claim. *See 222 Liberty Associates, supra*, 108 B.R. at 978. This objection can therefore be readily discounted.

### b. NON–COMPLIANCE WITH THE BANKRUPTCY CODE.

The Debtor next alleges that GECC's Plan violates 11 U.S.C. § 1129(a)(2) because GECC has not complied with the provisions of Title 11. It is true that this court can only confirm a plan if the plan proponent has complied with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(2). The Debtor alleges that GECC violated the provisions of the Bankruptcy Code in that it (1) violated 11 U.S.C. § 363 by repeatedly trying to bid its full debt for the Property; (2) violated the automatic stay by sending the demand letters to tenants in late 1992 directing them to pay their rent to GECC rather than to the Debtor; and (3) threatened to institute state court foreclosure proceedings against the Debtor.

We find no evidence that GECC failed to comply with the provisions of the Bankruptcy Code. GECC has not repeatedly tried to credit bid its debt for the Property. It has not yet even had the opportunity to credit bid, as GECC did not attempt to sell the Property at any time prior to filing its Plan. Further, absent cause, GECC is permitted to credit bid on the Property at any proposed bankruptcy sale. 11 U.S.C. § 363(k). As to GECC's alleged violation of the automatic stay, while we required the Debtor and GECC to send the tenants a joint letter to undo GECC's letter to the tenants demanding that they remit their future rent payments to GECC, we never held that GECC intentionally violated the terms of the Limited Relief in sending out the letters. Rather, we believe that its actions represented a good faith misinterpretation of the meaning of the December Order, which did, of course, grant Limited Relief from the stay. Finally, the Debtor has not presented any evidence that GECC threatened, in any other way, to proceed with state court foreclosure proceedings to a point which represented a violation of the terms of the Limited Relief. It was permitted to commence foreclosure under these terms. Therefore, we find that GECC's actions were not such that we could conclude that the GECC Plan fails to comply with § 1129(a)(2).

### c. § 1129(a)(4)

■ Next, the Debtor alleges that GECC has not submitted its attorneys fees and costs to this court for approval as required by 11 U.S.C. § 1129(a)(4). However, since GECC is not seeking to have any of these fees paid from the assets of the estate, it is not necessary that GECC submit its attorneys fees and costs to this court for approval.

### d. § 1129(a)(5)

■ The Debtor further alleges that GECC has failed to identify any successor to the Debtor and the identity of future management in its Plan, as required by 11 U.S.C. § 1129(a)(5). It argues that the proposed successor entity, GECE, was improperly not identified until the confirmation hearing.

The Debtor correctly states that 11 U.S.C. § 1129(a)(5) requires that the identify of any successor to the Debtor be disclosed. However, it does not require disclosure of the identity of a future purchaser of a debtor's property or the purchaser's future management company. Such a requirement would be difficult to satisfy, because the future purchaser and future purchaser's management company is typically unknown when a plan is proposed. Apparently the identity of GECE as a potential purchaser and manager of the Property was not known to GECC when the instant Plan was proposed. To the extent that GECE was identified at the confirmation hearing, we perceive that testimony as mere surplusage which neither improves nor detracts from the confirmability of GECC's Plan. The presentation of such surplusage is clearly not violative of § 1129(a)(5).

### e. IMPAIRMENT OF THE TENANTS' CLAIMS

■ The Debtor argues that Class 2, which includes the tenant's priority claims for security deposits, is impaired and, therefore, GECC improperly denied these creditors the right to vote. The pertinent Code section, 11 U.S.C. § 1124, provides that a claim is not impaired if, *inter alia,* the plan

(1) leaves the legal, equitable, and contractual rights from which the claim arises unaltered; or (2) provides that, on the plan's effective date, the holder of such claim receives, on account of such claim, cash equal to the allowed amount of the claim. 11 U.S.C. §§ 1124(1), (3). GECC's Plan allows the tenants to choose between (1) its assumption of their leases and treatment of their claims according to the applicable leases, leaving the tenant's legal, equitable and contractual rights unaltered; or (2) its rejection of their leases, in which case they are provided with full cash payments, on the effective date, on account of their claims. Both of these alternatives fall within the narrow scope of types of treatment of claimants which renders their claims unimpaired. Providing a class with an option for choosing between two types of treatment, both of which leave the claims unimpaired, does not render that class impaired.[3] Therefore, we reject this Objection to confirmation.

### f. GECC'S "INSIDER" STATUS

■ Finally, the Debtor alleges that, since GECC is the proponent of the Plan, it is an insider whose vote cannot be considered under Section 1129(a)(10) and, therefore, no impaired, non-insider class has accepted GECC's Plan. The term "insider," as to a partnership debtor, includes, per 11 U.S.C. § 101(31)(C), the following:

(i) general partner in the debtor;

(ii) relative of a general partner in, general partner of, or person in control of the debtor;

(iii) partnership in which the debtor is a general partner;

(iv) general partner of the debtor; or

(v) person in control of the debtor.

■ A plan proponent is not within the scope of "insiders" expressly identified in § 101(31)(C). However, the list of insiders is nonexclusive, and the term includes a broad range of parties who have a close relationship with the debtor. *In re Ingleside Associates,* 136 B.R. 955, 961 (Bankr.E.D.Pa.1992).

---

**3.** This issue can be contrasted with our conclusion, in the Memo, slip op. at *3, that the Debtor's Plan did impair the tenants' claims, because

one of the options provided was treatment which was *not* within the scope of 11 U.S.C. § 1124.

According to the legislative history, "[a]n insider is one who has a significantly close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." S.REP. NO. 95–989, 95th Cong., 1st Sess. 25 (1978), U.S.Code Cong. & Admin.News 1978, p. 5810. In this case, we find that the Debtor and GECC are engaged in a heightened adversarial relationship and clearly at arms length from one another. Therefore, their relationship does not warrant special scrutiny.

We acknowledge that there may be cases where a plan proponent is an insider because it exercises significant influence over the debtor's decisions and becomes deeply involved in its business. *See e.g., In re Allegheny Int'l, Inc.,* 118 B.R. 282, 297–98 (W.D.Pa.1990). However, that is not the case here. There is no evidence that GECC influenced or controlled the Debtor. Thus, GECC is not an insider and its vote can be counted in determining whether there is an impaired class which has accepted GECC's Plan.

In summary, the Debtor's Objections to GECC's Plan are meritless, and GECC's Plan is therefore found to satisfy the standards for confirmation.

5. *THIS COURT CHOOSES TO CONFIRM GECC'S PLAN, AS IT IS PREFERRED BY WHAT IS EASILY THE DEBTOR'S LARGEST CREDITOR, AND THE CHOICE OF GECC'S PLAN WILL NOT FRUSTRATE ANY FUNDAMENTAL BANKRUPTCY PRINCIPLES.*

█ In a situation where, as in the instant setting, two plans are presented which both satisfy the requirements of 11 U.S.C. §§ 1129(a), (b), we may only confirm one plan, as per the following passage of 11 U.S.C. § 1129(c):

(c) Notwithstanding subsections (a) and (b) of this section and except as provided in section 1127(b) of this title, the court may confirm only one plan, unless the order of confirmation in the case has been revoked under section 1144 of this title. If the requirements of subsections (a) and (b) of this section are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm.

In choosing between the instant confirmable plans, we note that § 1129(c) expressly provides that we must consider the preferences of creditors and equity holders.

In this case, the preferences of the creditors are overwhelmingly in favor of GECC's Plan. Other than GECC, all of the creditors are unimpaired and, therefore, are deemed to have accepted GECC's Plan. Additionally, GECC, the principal creditor in the case, with a claim in excess of $6,700,000, has, not surprisingly, voted in favor of its own Plan.

The equity holders support the Debtor's Plan. Eighteen (18) of the approximately 34 limited partners, and all but one of such partners casting a ballot, have voted to reject GECC's Plan. Meanwhile, thirteen (13) out of fourteen (14) interest holders casting ballots on the Debtor's Plan voted to accept it.

At this juncture, we should note that it is our practice to give most debtors at least one clear chance to confirm a plan. *See In re 641 Associates, Ltd.,* 1993 WL 332646, at *10 (Bankr.E.D.Pa. August 26, 1993). However, in an effort to avoid encouraging debtors from proposing "stalking horse" plans to obtain guidelines from the court regarding what would constitute a minimally confirmable plan, and then formulating a plan out of the court's guidelines, we rarely allow single asset debtors more than one opportunity to confirm a plan. *Id.*

In the instant case, it appears that the Debtor may have exhibited exactly the sort of behavior which we seek to avoid. With the law of the case as pronounced by this court in the Memo as to why its previous plan could not be confirmed in hand, the Debtor is now seeking confirmation of its fourth plan of reorganization. In fact, the Debtor is affirmatively arguing that, since its Plan satisfies the guidelines we set forth in the Memo, it should, for that reason, be confirmed. And perhaps it would be, if the time lost in futile plans could be discounted, and if GECC had not taken the responsible

step of preparing a competing plan. *See 222 Liberty Associates, supra,* 108 B.R. at 997. However, in light of the fact that the Debtor and its equity holders have already had three opportunities to confirm a plan and have failed to do so, we are less than anxious to give their preferences deference at this time.

We also cannot ignore that fact that the general unsecured creditors will be paid in full under GECC's Plan and will only receive ten (10%) percent of their claims under the Debtor's Plan. Also we note that, under the Debtor's Plan, GECC would not be paid on its secured claim for fifteen years. This is significantly beyond the April 30, 1995, maturity date of the loan to which the Debtor agreed in the Note. Furthermore, since the interests of the equity holders currently have no value, the $50,000 payment which they would receive under GECC's Plan provides them with a return on a currently worthless investment. In sum, the GECC Plan is not merely a dry liquidation, in which it would be the only beneficiary, but rather it provides at least some payments to all parties who have suffered economically from their involvement with Debtor due to, principally, the Debtor's victimization by the real estate recession of the 1990's.

We are also impressed by the far greater feasibility of GECC's Plan, *i.e.,* the far greater likelihood that it will be fully consummated, than the Debtor's Plan. A liquidation can certainly be accomplished by GECC, with only the Debtor itself and its investors (such as Eugene J. Gillespie, Jr., Esquire, who testified at trial), whose equity has been wiped out by the effect of the recession, experiencing any detriment. Success of the Debtor's Plan is premised on an end to the real estate recession, a prospect which is not in sight. It may not be equitable to risk further deterioration of GECC's substantial investment on the slim possibility that an economic renaissance will arrive which will cause Gillespie and others like him to recover their apparently-lost investments. We can understand why such investors would be willing and anxious to take such a chance as opposed to merely accepting their losses. However, we cannot indulge such parties at the expense of creditors.

The Debtor relies on *In re Oaks Partners, Ltd.,* 141 B.R. 453, 465 (Bankr.N.D.Ga.1992), for the proposition that reorganization is preferable to liquidation and the purpose of bankruptcy is to preserve economic units. Pertinent legislative history indeed provides that

[t]he purpose of a business reorganization case, unlike a liquidation case, is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders.... It is more economically efficient to reorganize than to liquidate, because it preserves jobs and assets.

House Report, *supra,* at 220, U.S.Code Cong. & Admin.News 1978, p. 6179.

We agree that, in many contexts, reorganization is preferable to liquidation. However, most of the reasons for preferring reorganizations are not present in the situation of an archetypical one-asset realty partnership which the Debtor presents in this case. There are no jobs to be preserved by the reorganization of the Debtor. The Property will preserve its value, if the economic situation does not further waver, regardless of who owns it. GECE is, if anything, more likely to be able to fund necessary improvements to the Property than the Debtor, as the Debtor's proposed $350,000 capital contribution is at best minimally sufficient.

Therefore, we do not believe that there is any practical reason to prefer a reorganization plan over a liquidation plan in this case. For all of the foregoing reasons, but mostly because of its superior treatment of all creditors and possibly even the Debtor's interest holders, we believe that GECC's Plan is preferable to the Debtor's Plan under the terms of 11 U.S.C. § 1129(c).

*E. CONCLUSION*

An Order confirming GECC's Plan, and, therefore, denying confirmation of the Debtor's Plan and rendering the Stay Motion moot, will be entered.

**144**

*ORDER*

AND NOW, this 29th day of October, 1993, after a consolidated hearing of September 22, 1993, to consider confirmation of the Debtor's Fourth Amended Plan ("the Debtor's Plan") and the Objections of General Electric Capital Corporation ("GECC") thereto; GECC's own Second Amended Plan ("the GECC Plan") and the Objections of the Debtor thereto; and the Motion of GECC for relief from the automatic stay ("the Stay Motion"), which incorporated the record of proceedings relating to confirmation of the Debtor's Third Amended Plan and the Stay Motion on June 2, 1993, it is hereby ORDERED AND DE-CREED as follows:

1. The GECC Plan is CONFIRMED.

2. Although it is confirmable, by reason of confirmation of the preferable GECC Plan, confirmation of the Debtor's Plan is DE-NIED.

3. The Stay Motion is DISMISSED as moot.